Richard and Miriam WARNER, Souhail Karram, Ian and Bobbie Payne, Carrie Monier, Marie and Louise Riccobono, Emil and Eleanor Danciu, and Joanne Davis, individually and on behalf of all others similarly situated, Plaintiffs,

v.

THE CITY OF BOCA RATON, a Florida municipal corporation, Defendant.

No. 98–8054–CIV–RYSKAMP.

United States District Court, S.D. Florida, Northern Division.

Aug. 31, 1999.

Charlotte Danciu, Boca Raton, FL, Lynn G. Waxman, James Kellogg Green, West Palm Beach, FL, for Plaintiffs.

John Orrin McKirchy, Boca Raton, FL, Bruce S. Rogow, Ft. Lauderdale, FL, Beverly A. Pohl, Boca Raton, FL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RYSKAMP, District Judge.

THIS CAUSE came on for trial before the Court and the issues having been duly tried, the Court hereby renders its findings of fact and conclusions of law.

## I. FINDINGS OF FACT

In this action, it is alleged that certain Rules and Regulations (the "Regulations") promulgated by the City of Boca Raton

(the "City") for the maintenance of its Municipal Cemetery (the "Cemetery") violate the plaintiffs' federal and state guarantees of freedom of religious exercise, freedom of speech and due process of law. A trial on the issues established the following material facts by a preponderance of the evidence.

### A. The Cemetery

The City owns, operates and maintains a 21.5 acre Cemetery for its residents. Since 1944, the Cemetery has been located south of Palmetto Park Road, on Fourth Avenue, in Boca Raton, Florida. The Cemetery grounds extend east and west of Fourth Avenue which runs north and south.

The Cemetery is divided into several sections. The oldest section, known as Section A, is located west of Fourth Avenue and contains graves and monuments that were moved from a prior site. The newer sections of the Cemetery are located east of Fourth Avenue.

Purchasers of Cemetery plots[1] (the "Plot Owners") receive a Certificate of Ownership which identifies the Plot Owner's interest in the "exclusive right of burial of the human dead in [the plot]." *See* Def.'s Ex. 7. This interest is subject to the following express limitations:

1. That the burial right herein granted will be used only in conformity with the Cemetery Rules and Regulations as they may be from time to time adopted or amended.

2. That the property herein described shall forever remain under the exclusive control of [the City] for the purposes of care and maintenance.

*Id.* The purchase and sale transaction does not convey property *via* a deed nor is the transaction recorded. Moreover, Plot Owners do not pay property taxes on the plots.

---

1. The Cemetery is divided into lots and plots. A lot is a numbered division as shown on the Cemetery map and consists of more than one plot. A plot is a space of sufficient size to accommodate a single depth in-earth burial. *See* Cemetery Rules and Regulations (hereinafter "Regulations") §§ I(11) & I(18)).

### B. Management of the Cemetery

The Boca Raton City Council is charged with managing the affairs of the Cemetery. *See* Boca Raton Code of Ordinances, art. II, § 13–36 ("The city cemetery shall be known as the Boca Raton Municipal Cemetery and its affairs shall be administered and supervised by the city council"); § 13–43 ("The city council may establish policy from time to time regarding curbs, foundations, monuments and markers in the Boca Raton Municipal Cemetery"). Pursuant to this express authority, the City has promulgated Regulations for the Cemetery which have been incorporated into the City ordinances and which have the effect of law. *Id.* § 13–37.

#### 1. The 1982 Prohibition on Vertical Grave Decorations

In November 1982, the City adopted a Regulation which prohibits vertical grave markers,[2] memorials,[3] monuments[4] and other structures (collectively referred to hereafter as "grave decorations") on Cemetery plots. *See* Regulations § XIV(2). In particular, § XIV(2) of the Regulations provides:

> No memorials, monuments, or enclosures shall be permitted above ground in any section of the Cemetery grounds except in Section 'A'.[5] Stone or bronze markers are allowed in all other sections provided that they are level with the ground surface.

The horizontal grave marker style adopted by the City in 1982 is known as a "memorial garden" and has become the industry standard for modern cemeteries.

The use of horizontal grave markers promotes the City's interests in: 1) making the most efficient use of Cemetery space; 2) ease of access of earth-moving equipment to plots for burial and disinterment purposes; 3) ease of grounds maintenance; 4) ensuring the safety of grounds keepers and visitors; and 5) maintaining a uniform appearance and aesthetically pleasing environment in the Cemetery. The City established that the use of vertical grave decorations would permit fewer grave sites in the Cemetery, impede access to the grave sites, make grounds maintenance more difficult and dangerous for grounds keepers and visitors, and create visual clutter. Most importantly, the use of vertical grave decorations would make it difficult to access and dig graves with the large machinery used by the City for this purpose. Although the City could avoid this problem by digging graves by hand, this practice would be more dangerous because of the risk that the ground would collapse on the grave diggers.

#### 2. The 1988 Regulation Vesting Cemetery Manager With Discretion to Make Temporary Exceptions and Modifications to the Regulations

In 1988, the City adopted a Regulation which granted the Cemetery Manager the discretion to make temporary exceptions and modifications to the Regulations. *See* Regulations § XVI(1). In particular, Section XVI(1) of the Regulations provides:

(1) Exceptions and Modifications— Special cases may arise for which the literal enforcement of any rule may im-

---

**2.** The Regulations define a "marker" as a "memorial which does not extend vertically above the ground and is constructed of approved metal or stone containing names, dates, or other engraved lettering used in identification of one or more persons and placed at the head of a lot or plot." *Id.* § I(13).

**3.** The Regulations define a "memorial" as a "monument, marker, tablet, headstone, private mausoleum or tomb for family or individual use, tombstone, coping, lot enclosure, and surface burial vault, urn, crypt and niche

places or bronze lettering on crypts or niches." Regulations § I(15).

**4.** The Regulations define a "monument" as a "tombstone or memorial of granite or other approved materials, which shall extend vertically above the surface of the ground." *Id.* § I(16).

**5.** Section A is exempt from the prohibition because it was already in existence at the time the Regulation was enacted, and because it contained vertical monuments which had been moved from a previous cemetery site.

pose unnecessary hardship. The Cemetery Manager, after consultation with the Recreation Services Department Director, reserves the right to make temporary exceptions, suspensions and modification [sic] of any rule or regulation, when in the Cemetery Manager's discretion such modification seems advisable. Such temporary exceptions, suspensions and modifications shall in no way be construed as effecting [sic] the general enforcement of these rules and regulations nor as eliminating the authority of the City Council in approving or disapproving all permanent changes in rules or policies of the Cemetery/Mausoleum.

## C. The Plaintiffs' Use of the Cemetery

The named plaintiffs are all residents of the City who have purchased plots in the Cemetery. Between 1984 and 1996, the plaintiffs decorated the graves of family members and loved ones with standing statues, crosses, stars of David, ground covers and borders in violation of the Regulations.

It is undisputed that the plaintiffs placed vertical decorations on their Cemetery plots in observance of sincerely held religious beliefs.[6] Several of the plaintiffs erected vertical decorations in observance of their Jewish faith. For example, plaintiff Richard Warner and his mother plaintiff Miriam Warner placed ground cover and edging stones on their family members' graves in observance of a Jewish tradition that grave sites are to be protected and never walked upon. Plaintiffs Ian and Bobby Payne placed a standing star of David and grave coverings on their son's grave in order to identify their son as Jewish and to protect the grave from being walked upon.

Additionally, several of the plaintiffs erected vertical grave decorations in observance of their Christian faith. For example, plaintiff Souhail Karram placed a standing cross on his wife's grave because he believes that Jesus Christ was crucified on a standing cross and rose again, and, therefore, the standing cross symbolizes that his wife will also rise again. Plaintiff Carrie Monier placed a vertical statue of the Sacred Heart of Jesus as well as a rope around her brother's grave because she believes graves should be protected and never walked upon. Carrie Monier's sister, plaintiff Barbara Cavedoni placed a standing cross on her loved one's grave site because the crucifixion and death of Christ has for centuries been depicted on a standing cross and, therefore, in her view, it would be disrespectful to honor and pray to a horizontal cross. Plaintiff Marie Riccobono decorated her father's grave with a statue of Jesus to watch over him and surrounded the grave marker with edging blocks and stone. Plaintiff Joanne Davis memorialized the grave of her infant son with a two-foot high bronze statue of two children playing, with small crosses and with a statue of Jesus holding a child. Finally, plaintiff Eleanor Danciu believes the statues of the Blessed Mother and St. Francis which decorate her parents' graves are her channels of prayer to God.

## D. The City's Response to the Plaintiffs' Conduct

In August 1991, the City sent notices to Plot Owners who had placed vertical decorations on their plots requesting that the plots be brought into compliance with the Regulations within thirty days. Plot Owners were informed that if they did not comply with the City's request, the City would remove the noncomplying structures. This communication created some controversy, and a minority of Plot Owners failed to comply with the City's request.

**6.** By Order filed August 17, 1998, this Court dismissed count I as to plaintiffs Richard and Miriam Warner, Carrie Monier, and Marie and Louise Riccobono because these plaintiffs had failed to allege that they placed standing decorations on their Cemetery plots in observance of religious beliefs. At trial, however, these plaintiffs established that they had in fact placed standing decorations on their Cemetery plots in observance of religious beliefs.

A second notice requesting compliance with the Regulations was sent in July 1992. Plot Owners were advised that after 15 days, any remaining vertical decorations would be removed and held for a 10–day period and then disposed of if not claimed. Again, not all Plot Owners complied with the City's request

· Those who objected to the enforcement of the Regulations voiced their views to the City Council which agreed to postpone removal of the vertical decorations pending further study. On August 17, 1992, the City Manager's office issued a memorandum which stated in pertinent part that:

City staff will *not* be moving forward with the removal of memorial items from grave sites at this time. Instead, staff will be re-evaluating the existing ordinance to determine if any modifications should be made. A complete analysis of the ordinance and its impact will be accomplished prior to any such activity. [emphasis in original].

In July 1996, the City revised the Regulations to accommodate the needs of grieving families. *See* Regulations § IX(1). In particular, § IX(2) of the Regulations provides:

The placing of any articles [7] of any kind upon plots or upon or in front of crypts and niches that are not specifically authorized under these rules and regulations shall not be permitted. The Cemetery Manager reserves the right to remove same. The placing of small articles on a headstone memorial after a sixty (60) day period from the · date of the burial shall be prohibited. The placing of small articles on a headstone memorial on the deceased's birthday, Mother's Day, Father's Day, the anniversary date of the deceased's death, and on national holidays may be permitted. The small articles may be permitted for a period commencing one (1) day before and ending five (5) days after such birthday, anniversary or holiday. The Cemetery Manager reserves the right to remove all articles which interfere with the maintenance of the Cemetery or Mausoleum, or interfere with the accessibility to another plot crypt or niche in the preparation of an interment, disinterment, entombment or disentombment.

On August 27, 1996, while the Regulations were being studied and evaluated, the City Council directed the City Manager, as an interim measure, to refrain from removing any decorations on graves which were in place as of that date, and directed the Cemetery Manager to enforce the Regulations with respect to decorations placed on graves after that date.

Additionally, the City commissioned a survey of Plot Owners, designed and conducted by researchers at Florida Atlantic University ("FAU"), to identify the Plot Owners' desires with respect to vertical grave decorations in the Cemetery.

The FAU survey concluded that:

The results of this survey have revealed that the majority of the plot owners, regardless of the time length of plot ownership, location (east or west) of plot, or frequency of visitation, believe that the July 23, 1996 Rules and Regulations should be followed by all plot owners as required by the City of Boca Raton. They believe that contributions to a Tree Legacy landscape beautification program is a much higher priority than allowing plot owners to decorate plots with no limitations. They believe that the regulations should apply to all current owners and to future owners.

The FAU study recommended, *inter alia,* that the Regulations be implemented and uniformly enforced by the City and that all plots be brought into compliance with the Regulations.

---

7. The Regulations define "articles" as "[i]ncluding, but not limited to, boxes, shells, toys, ornaments, chairs, settees, crosses, statues, benches, vases, rocks, fencing, borders, wind-chimes, candles, candle holders, plants, shrubs, trees or herbage of any kind." Regulations §` I(1).

On June 10, 1997, at the regular meeting of the City Council, the City took up the issue of grave decorations in the Cemetery. The City Council first considered and rejected, by a three to two margin, a resolution "to permit existing articles on plots to remain and to permit owners of plots, as of the effective date of this resolution, to place articles of the same character and nature as currently exist at the cemetery." Def.'s Mot. Dis. Compl. Ex. 19. Thereafter, the City Council adopted the following Staff Recommendations:

1. The Rules and Regulations adopted on July 23, 1996 for the Cemetery and Mausoleum should be implemented and enforced uniformly; and

2. All cemetery plot decorations should be brought into compliance with the July 23, 1996 adopted Rules and Regulations within 90 days.

*Id.* Ex. 20. Plot Owners were subsequently notified that if they did not comply with the Regulations by January 15, 1998, the City would remove all noncomplying articles.

### E. The Plaintiffs' Lawsuit

Thereafter, the plaintiffs filed suit in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida against the City of Boca Raton, Mayor Carol Hanson, Deputy Mayor William "Bill" Glass, and City Council members Steven L. Abrams, Wanda E. Thayer and Susan Welchel.[8] The defendants timely removed to this Court on January 30, 1998.

On June 12, 1998, the plaintiffs filed an amended class action complaint naming the City as the sole defendant, and alleging that the prohibition on vertical grave decorations violates their federal and state rights to freedom of religious expression, freedom of speech and due process of law. In particular, count I alleges that the prohibition substantially burdens the plaintiffs' exercise of religion in violation of the recently enacted Florida Religious Freedom Restoration Act of 1998 (the "Florida

RFRA"), Fla. Stat. § 761.01 *et seq.* Count II alleges that the prohibition violates the plaintiffs' First Amendment rights to the free exercise of religion and freedom of speech. Count III alleges that enforcement of the prohibition would deprive the plaintiffs of a property interest in maintaining vertical grave decorations on their Cemetery plots in violation of the Due Process Clause of the Fourteenth Amendment. Finally, count IV alleges that the prohibition violates the plaintiffs' rights under the Florida Constitution to the free exercise of religion, freedom of speech and due process of law.

By Order filed August 17, 1998, this Court dismissed count I as to plaintiffs Richard and Miriam Warner, Carrie Monier, and Marie and Louise Riccobono. On the same date, this Court granted the plaintiffs' motion to maintain a class action and directed class members to be notified.

### II. *CONCLUSIONS OF LAW*

This case evokes strong emotions and raises a host of complicated legal issues. In the end, however, the case presents a simple question: Does any federal or Florida law relieve an individual from the obligation to comply with Regulations which uniformly prohibit vertical grave decorations in the Boca Raton Municipal Cemetery? In this Court's view, the answer is no.

### A. Count I—The Florida RFRA

In count I of their amended complaint, the plaintiffs allege that the City's prohibition on vertical grave decorations substantially burdens their exercise of religion in violation of the recently enacted Florida RFRA. The Court disagrees.

### 1. The Historical Background of the Florida RFRA

There are no reported decisions construing the Florida RFRA. However, the

---

**8.** The City agreed to stay enforcement of the challenged Regulations until the conclusion of this lawsuit.

Court does not write on a blank slate, because this statute is merely the latest attempt in a long struggle to define the scope of protection that should be afforded to religious practices burdened by neutral laws of general applicability.

Early Supreme Court decisions yielded the general principle that the Free Exercise Clause does not relieve an individual of the obligation to comply with a neutral law of general applicability. *See Reynolds v. United States,* 98 U.S. 145, 166–67, 25 L.Ed. 244 (1878) (rejecting claim that criminal laws against polygamy could not be constitutionally applied to those whose religion commanded the practice). The *Reynolds* Court explained:

Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices ... Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.

*Id.* Some years later, Justice Frankfurter reaffirmed this principle in *Minersville School Dist. v. Gobitis,* 310 U.S. 586, 594, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940), observing that "[c]onscientious scruples have not, in course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs."

Beginning with the seminal decision in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Supreme Court began to expand the scope of protection afforded to religious practices. Eventually, the Court adopted the rule that a neutral law of general applicability which substantially burdens an individual's religious practices will run afoul of the Free Exercise Clause if it is not narrowly tai-

lored to achieve a compelling governmental interest. *See, e.g., Thomas v. Review Bd.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest.").

In 1990, while purporting not to do so, the Supreme Court again reversed course in *Employment Div., Dept. of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Despite the broad and seemingly unequivocal pronouncements in *Sherbert* and her progeny, the *Smith* Court explained, "[w]e have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Id.* at 878–79, 110 S.Ct. 1595. The *Smith* Court concluded that *Sherbert* and other cases applying strict scrutiny to neutral laws of general applicability constituted narrow exceptions to this general principle. *Id.* at 881–85, 110 S.Ct. 1595.

The *Smith* decision was met with widespread disapproval by those who viewed the decision as a departure from settled free exercise jurisprudence and as a dramatic curtailment of religious freedom. A broad-based coalition of advocates of religious freedom took their cause to Congress which eventually passed the Religious Freedom Restoration Act of 1993 (the "Federal RFRA"), 42 U.S.C. §§ 2000bb *et seq.* The unabashed purpose of the Federal RFRA was to overrule *Smith* and to restore the compelling interest test first set forth in *Sherbert. Id.* at §§ 2000bb(a)(4) & (b)(1).

Four years later, in *City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court declared the Federal RFRA unconstitutional at least as applied to the states.[9] The Court found that in enacting the Fed-

---

9. There exists considerable disagreement regarding whether the Federal RFRA is constitutional as applied to the federal government.

*See, e.g., Adams v. Commissioner,* 170 F.3d 173, 175 n. 1 (3rd Cir.1999).

eral RFRA Congress had exceeded its enforcement power under § 5 of the Fourteenth Amendment. *Id.*

In response, advocates of religious freedom took their cause to the state legislatures. In 1998, the Florida legislature passed the Florida RFRA which is modeled after the Federal RFRA and like the federal statute seeks to establish the compelling interest test first set forth in *Sherbert. See* Fla. Stat. § 761.01 ("it is the intent of the Legislature of the State of Florida to establish the compelling interest test as set forth in *Sherbert v. Verner* . . .").

### 2. The Florida RFRA

The Florida RFRA provides in pertinent part:

> The government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, except that government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person:
>
> (a) Is in furtherance of a compelling governmental interest; and
>
> (b) Is the least restrictive means of furthering that compelling governmental interest.

Fla. Stat. § 761.03(1).

Under the terms of the statute, a plaintiff has the burden of showing that: 1) he or she has engaged in the exercise of religion; and 2) that the government has substantially burdened this religious exercise. If the plaintiff meets this burden, the burden shifts to the government to demonstrate that its action: 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

### a. Have the plaintiffs engaged in the "exercise of religion" within the meaning of the Florida RFRA?

The Florida RFRA defines the "exercise of religion" as "an act or refusal to act that is substantially motivated by a religious belief, whether or not the religious exercise is compulsory or central to a larger system of religious beliefs." *Id.* § 761.02(3). The plaintiffs contend that any act substantially motivated by a sincerely held religious belief constitutes the exercise of religion under this definition. The Court finds, however, that the plaintiffs' proposed construction is overly broad. A review of the statute's history, its plain language and the application of ordinary rules of statutory construction reveal that the Florida legislature intended to limit the statute's coverage to conduct that, while not necessarily compulsory or central to a larger system of religious beliefs, nevertheless reflects some tenet, practice or custom of a larger system of religious beliefs. Conduct that amounts to a matter of purely personal preference regarding religious exercise does not fall within the ambit of the Florida RFRA.

The historical background of the Florida RFRA provides some insight into the Florida legislature's intent in enacting the statute. As noted above, the Florida RFRA was enacted in response to the Supreme Court's decision in *City of Boerne* declaring the Federal RFRA unconstitutional and was modeled closely after the federal statute. While the interpretation of the Federal RFRA in the federal courts was far from uniform, the statute was generally construed to protect only practices which were compulsory or central to an individual's religious tradition. *See, e.g., Mack v. O'Leary,* 80 F.3d 1175, 1178 (7th Cir.1996) (collecting cases). The Florida RFRA's express admonition that a practice need not be "compulsory or central to a larger system of religious beliefs" in order to fall within the statute's ambit, expresses a clear intent by the Florida legislature to expand the scope of protection afforded to religious practices beyond that provided by the Federal RFRA. The question this Court must resolve is: How far beyond?

In rejecting the Federal RFRA's "compulsory or central" requirement, the Florida legislature may have been attempting to correct what appears to be a manifest error in the federal courts' interpretation of the federal statute. That is to say, the "compulsory or central" requirement was completely at odds with Congressional intent as reflected in the legislative history of the Federal RFRA. During hearings before the House Judiciary Committee, Representative Stephen Solarz, the original sponsor of the Federal RFRA, stated:

> Were Congress to go beyond the phrasing chosen by the drafters of the First Amendment by specifically confining the scope of this legislation to those practices *compelled or proscribed* by a sincerely held religious belief in all circumstances, we would run the risk of excluding practices which are generally believed to be exercises of religion worthy of protection. For example, many religions do not require their adherents to pray at specific times of day, yet most members of Congress would consider prayer to be an unmistakable exercise of religion.

Hearings on H.R. 2797 Before the House Judiciary Comm., 102d Cong., 2d Sess. 128–30 (May 13, 1992) [emphasis added].

Representative Solarz' testimony, while clearly indicating an intent not to confine the Federal RFRA's coverage to practices which are compelled or proscribed by one's religious tradition, also gives some indication of the intended limits of the federal statute's coverage. In particular, Solarz stared:

> To say that the "exercise of religion" might include acts not necessarily compelled by a sincerely held religious belief is not to say that any act merely consistent with, or not proscribed by one's religion would be an exercise of religion. As I pointed out in my testimony, it would not be reasonable to argue, for example, that a person whose religion did not proscribe the possession of a machine gun had a free exercise right to own one notwithstanding applicable federal laws.

*Id.* Thus, Solarz' testimony suggests that conduct that is merely consistent with or not proscribed by one's religious tradition does not amount to the "exercise of religion" under the Federal RFRA. In other words, the Federal RFRA was not intended to protect conduct that amounts to a matter of purely personal preference regarding religious exercise. Accordingly, it seems clear that the Federal RFRA was intended to protect conduct that, while not necessarily compulsory or central to a larger system of religious beliefs, nevertheless reflects some tenet, practice or custom of a religious tradition. To the extent the Florida RFRA's rejection of the "compulsory or central" requirement reflects an intent by the Florida legislature to adopt the correct interpretation of the Federal RFRA, the Florida RFRA should be similarly construed.

Moreover, the plain language of the Florida RFRA implies that a practice must be more than a matter of purely personal preference regarding religious exercise in order to fall within the statute's ambit. That is, the fact that the Florida RFRA explicitly states that a practice need not be "compulsory or central to a larger system of religious beliefs" in order to be subject to the protection of the statute, suggests that the practice must have some basis in a larger system of religious beliefs. *See Cassady v. Sholtz,* 124 Fla. 718, 169 So. 487, 490 (1936) ("The implications and intendments of a statute are as effective as the express provisions."); *Wolpin v. Philip Morris, Inc.,* 974 F.Supp. 1465 (S.D.Fla. 1997) (*quoting Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) ("Legislative intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'"). If the Florida legislature had meant to protect any act motivated by a sincerely held religious belief, it could have easily and more clearly said so.

This conclusion is reinforced by the fact that the plaintiffs' proposed con-

struction of the Florida RFRA would render the "compulsory or central" language of the statute mere surplusage and of no effect. It is a fundamental rule of statutory construction that "courts should avoid readings that would render part of a statute meaningless." *Unruh v. State*, 669 So.2d 242, 245 (Fla.1996) (*quoting Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So.2d 452, 456 (Fla.1992)). Moreover, "[s]tatutes should be construed to give each word effect." *Gretz v. Florida Unemployment Appeals Comm'n*, 572 So.2d 1384, 1386 (Fla.1991). These principles follow from the presumption that "the legislature does not intend 'to enact purposeless and therefore useless, legislation.'" *Unruh*, 669 So.2d at 245 (*quoting Sharer v. Hotel Corp. of America*, 144 So.2d 813, 817 (Fla.1962)).

If any act motivated by a sincerely held religious belief were protected under the Florida RFRA, then it adds nothing to the meaning of the statute to say that the act need not be compulsory or central to a larger system of religious beliefs. It is only where the act is presumed to have some basis in a larger system of religious beliefs that the qualification that the act need not be compulsory or central to such a system has any meaning. In short, in order to give effect to all the statutory language, the "exercise of religion" must mean conduct that, while not necessarily compulsory or central to a larger system of religious beliefs, nevertheless reflects some tenet, practice or custom of a larger system of religious beliefs.

■ The plaintiffs' proposed construction of the statute is unpersuasive for the additional reason that it would lead to absurd results. It is a settled rule of statutory construction that an interpretation of a statute which would lead to an absurd or unreasonable result should be avoided where possible. *See, e.g., Amente v. Newman*, 653 So.2d 1030, 1032 (Fla. 1995) ("If possible, the courts should avoid a statutory interpretation which leads to an absurd result.").

On the plaintiffs' view, neutral laws of general applicability would have to yield to practices reflecting any individual's singular yet sincerely held religious beliefs unless the law was narrowly tailored to achieve a compelling governmental interest. Because the strict scrutiny standard adopted by the Florida legislature is the most rigorous test in constitutional law, few laws would survive its application. *See, e.g., Smith*, 494 U.S. at 888, 110 S.Ct. 1595 (noting that few laws survive strict scrutiny). In the context of the Cemetery's Regulations, the plaintiffs' proposed construction of the Florida RFRA would lead to cemetery anarchy. For example, reasonable size and height limitations on grave decorations would have to yield to sincerely held religious beliefs that grave decorations should be larger than the prescribed limitations. Moreover, the Cemetery's operating hours would have to yield to sincerely held religious beliefs that grave sites should be visited outside the Cemetery's operating hours. The Court does not believe that the Florida legislature intended such a result.

■ Thus, the Court concludes that in order to establish a cognizable claim under the Florida RFRA, a plaintiff must demonstrate a substantial burden on conduct that, while not necessarily compulsory or central to a larger system of religious beliefs, nevertheless reflects some tenet, practice or custom of a larger system of religious beliefs. Conduct that reflects a purely personal preference regarding religious exercise will not implicate the protections the Florida RFRA.

**b. Does the Court's construction of the Florida RFRA violate the First Amendment?**

Having determined the scope of the protection afforded by the Florida RFRA, the Court turns to the problem of developing a workable test for deciding whether a particular practice reflects some tenet, custom or practice of a larger system of religious beliefs or whether the practice reflects a

matter of purely personal preference regarding religious exercise. In embarking on this task, the Court is cognizant of the plaintiffs' concern that the Court's interpretation of the Florida RFRA involves the courts in the "unacceptable 'business of evaluating the relative merits of differing religious claims.'" *Smith*, 494 U.S. at 887, 110 S.Ct. 1595 (*quoting United States v. Lee*, 455 U.S. 252, 263 n. 2, 102 S.Ct. 1051, 71 L.Ed.2d 127, (1982) (Stevens, J., concurring)). However, the Court believes that the plaintiffs' concerns are overstated.

It is true that the Supreme Court has repeatedly held that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Smith*, 494 U.S. at 887, 110 S.Ct. 1595 (*quoting Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)); *Thomas*, 450 U.S. at 716, 101 S.Ct. 1425 ("Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation."). *See also Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 450, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (holding that the First Amendment forbids civil courts from interpreting particular church doctrines and the importance of those doctrines to a religion). The danger, of course, is that "courts will find themselves taking sides in religious schisms if they must opine on matters of religious obligation." *Mack*, 80 F.3d at 1179.

Under the Court's construction of the Florida RFRA, however, courts are not required to interpret and weigh religious doctrine to determine the centrality of a particular practice to a religious tradition. Nor are courts required to determine whether a particular practice is compulsory or prohibited by a religious tradition. Rather, a court's inquiry is extremely limited and purely factual: Does the practice in question reflect some tenet, custom or practice of a larger system of religious beliefs? Accordingly, the risk of courts taking sides in religious controversies is minimized.

Moreover, the Supreme Court has sanctioned such limited inquiries into religious doctrine. For example, in *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929), the Court held that civil courts may review the decisions of church tribunals "on matters purely ecclesiastical" for arbitrariness. *See also Presbyterian Church*, 393 U.S. at 447–451, 89 S.Ct. 601 (reaffirming that *Gonzalez* delineates the scope of permissible inquiry into religious doctrine). A determination of whether a particular ecclesiastical decision is arbitrary necessarily requires a minimal inquiry into whether the decision has some basis in religious doctrine. Similarly, a court's inquiry under the Florida RFRA is limited to whether a particular practice has some basis in the doctrines, traditions or customs of a religious tradition. Accordingly, the Courts finds that its construction of the Florida RFRA does not violate the First Amendment.

### c. Does the maintenance of vertical grave decorations on grave sites reflect some tenet, custom or practice of the plaintiffs' religious traditions or merely the plaintiffs' personal preference with regard to decorating graves?

During the course of the trial, the Court heard testimony from several experts in theology. It was generally agreed that the significance of a particular practice within a religious tradition can be ascertained by a consideration of the religion's sacred texts, doctrines, traditions and customs. *See, e.g.*, Pl.s' Ex. 46 at 1 (Expert Report of Dr. Winnifred Fallers Sullivan) ("Religion scholars would also largely agree that authentic religious practices include both those founded in textually based doctrine taught by institutional hierarchies as well

as in folk traditions and customs passed down through families and communities."). Moreover, Dr. Daniel L. Pals, a professor and former Chair of the Department of Religious Studies at the University of Miami, developed a workable framework for determining the place of a particular practice within a religious tradition. *See* Def.'s Ex. 51.

■ Under Dr. Pals' framework, a court should consider four criteria in order to determine the place of a particular practice within a religious tradition. In particular, a court should consider whether the practice: 1) is asserted or implied in relatively unambiguous terms by an authoritative sacred text; 2) is clearly and consistently affirmed in classic formulations of doctrine and practice; 3) has been observed continuously, or nearly so, throughout the history of the tradition; and 4) is consistently observed in the tradition as we meet it in recent times. If a practice meets all four of these criteria, it can be considered central to the religious tradition. If the practice meets one or more of these criteria, it can be considered a tenet, custom or practice of the religious tradition. If the practice meets none of these criteria, it can be considered a matter of purely personal preference regarding religious exercise.

■ The plaintiffs contend that marking graves and decorating them with religious symbols constitute customs or practices of their religious traditions. Moreover, the plaintiffs contend that the display of such markers and religious symbols vertically has some independent significance in their religious traditions. The Court finds that while marking graves and decorating them with religious symbols constitute customs or practices of the plaintiffs' religious traditions, the particular manner in which such markers and religious symbols are displayed—vertically or horizontally—amounts to a matter of purely personal preference which is not protected under the Florida RFRA.

Applying Dr. Pals' test, it is clear that marking graves and decorating them with religious symbols constitute customs or practices of the Jewish and Christian traditions. In the Jewish tradition, grave markers have traditionally been used to demarcate graves and prevent people from walking on them. *See* Pl.s' Ex. 39 at 4 n. 7 (Expert Report of Rabbi Michael J. Broyde). The use of grave markers is identified in at least two of the four of the criteria noted above. In particular, while the Jewish sacred text and doctrines make little mention of grave marking, the practice of marking graves has been observed consistently throughout the history of the tradition and in recent times. *Id.* at 1–2.

In the Christian tradition, graves are customarily decorated with religious symbols in order to foster the community's awareness of the deceased as well as to give testimony to the deceased's commitment to the Christian life. *See* Def.'s Ex. 52 at 3. (Expert Report of Dr. Nathan Katz). The decoration of graves with religious symbols can be found in at least one of the four criteria described above. In particular, the decoration of graves with religious symbols has become a common practice in recent times. *Id.*

While the plaintiffs have established the significance of marking graves and decorating them with religious symbols, they have failed to demonstrate that their religious traditions accord any independent significance to the "verticality" of grave markers or religious symbols. For example, plaintiffs' expert Rabbi Broyde failed to identify any significance in the Jewish tradition to the manner in which grave markers are displayed. *See* Pl's Ex. 39 at 5. In fact, Rabbi Broyde concluded that a government regulation which required horizontal rather than vertical markers would not violate Jewish law. *Id.*

Plaintiffs' expert Dr. John A. McGuckin did testify to the importance of standing crosses on grave sites in the Christian faith and concluded that it would be sacrilegious to display a cross horizontally. *See* Pl.s' Ex. 44 at 6. However, Dr. McGuckin provided no objective basis for his opinion

and, therefore, the Court accords his testimony little weight.

Defendant's expert Dr. Pals provided the most comprehensive and systematic review of the significance of vertical grave markers and religious symbols in the Jewish and Christian traditions. *See generally* Def.'s Ex. 51. Dr. Pals' careful study concluded that neither the Jewish nor the Christian traditions accord any independent significance to the "verticality" of grave markers or religious symbols. *Id.*

Dr. Pals' study begins with a consideration of the significance of vertical grave markers in the Jewish tradition. First, Dr. Pals found that the use of vertical markers is neither asserted nor implied in the Torah, the Hebrew Scripture. *Id.* at 5–6. In fact, the Torah is virtually silent with regard to the issue of grave markers, and those few passages which discuss grave markers do not attach any importance to the type of marker used let alone to whether such markers are displayed vertically or horizontally. *Id.*

Second, a study of the classic commentaries of ancient rabbis found in the Talmud revealed that the use of vertical grave markers is not clearly and consistently affirmed in classic formulations of doctrine and practice. *Id.* at 7–8. In particular, the Talmudic commentaries suggest that use of grave markers is optional and do not accord any significance to the manner in which such markers are displayed. *Id.*

Third, Dr. Pals found that vertical markers have not been used continuously throughout the history of the tradition. *Id.* at 8–9. In fact, archeological evidence suggests that ancient Jewish grave sites were often simply painted white to demarcate them. *Id.* at 6.

Finally, Dr. Pals found that vertical grave markers have not been used consistently in recent times. *Id.* at 9–10. While many Jews of Ashkenazic heritage do place a vertical marker of sorts on the graves of family members, Sephardic and Ashkenazic Jews in Israel make almost exclusive use of horizontal rather than vertical grave markers. *Id.* at 9.

Dr. Pals then considered the significance of decorating graves with vertical religious symbols in the Christian tradition. First, he considered the Bible, the authoritative sacred text of Christianity, and found that the issue of decorating graves with religious symbols is not directly addressed. *Id.* at 10–13. Moreover, the Bible's passing references to grave decorations do not attach any significance to the manner in which such decorations are displayed. *Id.*

Second, Dr. Pals studied the writings of Christian theologians and found that they attached little significance to the form of burial memorials. *Id.* at 13–14. In particular, "they left no mandate that graves be universally marked in any one particular fashion, let alone with a vertical marker or monument." *Id.* at 14.

Third, Dr. Pals found that the practice of decorating graves with vertical religious symbols has not been observed continuously throughout the history of the Christian tradition. *Id.* at 14–16. In fact, historically most Christians were buried in common graves with no memorial whatsoever. *Id.* at 15–16.

Finally, Dr. Pals found that while the practice of decorating graves with religious symbols has increased in modern times, there is no significance to the manner in which such symbols are displayed. *Id.* at 16–18. In fact, the Catholic Archdiocese often uses horizontal grave decorations in its own cemeteries.

In sum, nowhere in the sacred texts, doctrines, traditions or customs of either the Jewish or Christian faiths can the principle be found that grave markers or religious symbols should be displayed vertically rather than horizontally. The primary objective of grave markers in the Jewish tradition—to demarcate and prevent the grave from being walked upon—can be achieved with either horizontal or vertical grave markers. Similarly, the primary objectives of decorating graves with religious symbols in the Christian tradition—to foster the community's awareness of the deceased and to give witness to the deceased's Christian life—can be achieved

with either horizontal or vertical religious symbols. Therefore, the Court concludes that while marking graves and decorating them with religious symbols constitute customs or practices of the plaintiffs' religious traditions, the plaintiffs' desire to maintain vertical grave markers and religious symbols reflects their personal preference with regard to decorating graves.

### d. Does the City's prohibition on vertical grave decorations substantially burden the plaintiffs' practices of marking graves and decorating them with religious symbols?

■ Having established that the plaintiffs have a protectable interest in marking graves and decorating them with religious symbols, the Court must next consider whether the City's prohibition on vertical grave decorations "substantially burdens" the plaintiffs' religious practices within the meaning of the statute. The Court finds that the prohibition does not substantially burden the plaintiffs' religious practices.

The Florida RFRA's "substantial burden" language is identical to the language in the Federal RFRA after which the state law was modeled. Under the Federal RFRA, a law substantially burdens a religious practice if it prohibits or significantly constrains the practice. *See, e.g., Werner*, 49 F.3d at 1480 ("To exceed the 'substantial burden' threshold, government regulation must significantly inhibit or constrain

[religious] conduct or expression ...". However, "[t]he government does not need to justify conduct that merely makes a particular religious practice inconvenient." *Muslim v. Frame*, 897 F.Supp. 215, 219 (E.D.Pa.1995).

The City's Regulations do not prohibit the plaintiffs from marking graves and decorating them with religious symbols. Rather, the Regulations permit only horizontal grave markers. These markers may be engraved with any type of religious symbol. Moreover, out of consideration for mourners vertical grave decorations are permitted for sixty days after the date of burial and for a few days around certain holidays. Aside from these times, however, vertical grave decorations are not permitted in the Cemetery.

The Court finds that these restrictions on the manner in which religious decorations may be displayed merely inconvenience the plaintiffs' practices of marking graves and decorating them with religious symbols. Accordingly, the Court finds that the prohibition on vertical grave decorations does not substantially burden the plaintiffs' exercise of religion within the meaning of the Florida RFRA.[10]

For the foregoing reasons, the Court finds that the plaintiffs have failed to establish that the City's Regulations violate the Florida RFRA. Judgment will be entered in favor of the City as to count I of the plaintiffs' amended complaint.[11]

---

**10.** The plaintiffs have established that removing markers from a grave constitutes a serious offense in the Jewish faith. *See* Pl.s' Ex. 39 at 5. The plaintiffs contend, therefore, that even if a prospective prohibition on vertical grave decorations does not substantially burden their religious exercise, removal of existing grave decorations would amount to a substantial burden. The Court disagrees. The plaintiffs placed vertical grave decorations on their Cemetery plots in violation of the Regulations. The Court cannot construe the Florida RFRA to reward the plaintiffs for not complying with the Regulations.

**11.** Because the Court finds that the plaintiffs have not established a cognizable claim under the Florida RFRA, the Court need not address the statute's constitutionality. The Court does

note, however, that the statute, which operates to exempt religious but not secular conduct from compliance with neutral laws of general applicability, evidences a preference for religion which arguably runs afoul of the Establishment Clause of the First Amendment. *Cf., City of Boerne*, 521 U.S. at 536, 117 S.Ct. 2157 (Stevens, J. concurring) ("In my opinion, the [Federal RFRA] is a 'law respecting an establishment of religion' that violates the First Amendment to the Constitution."). Additionally, separation of powers concerns could be implicated to the extent the Florida RFRA is an attempt to expand the scope of the Florida Free Exercise Clause through legislation. *See, e.g., Marbury v. Madison*, 1 Cranch 137, 178, 2 L.Ed. 60 (1803) ("It is emphatically the province and

### B. Count II—The First Amendment

In count II of their amended complaint, the plaintiffs allege that the prohibition on vertical grave decorations violates their First Amendment rights to the free exercise of religion and freedom of speech. The Court will consider the plaintiffs' free exercise and free speech claims in turn.

### 1. The Free Exercise Claim

The Free Exercise Clause of the First Amendment, which applies to the States through the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), provides that "Congress shall make no law respecting an establishment of religion, *or prohibiting the free exercise thereof . . .*" U.S. CONST. amend. I. [emphasis added]. "The protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

▮▮▮▮ Thus, if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is invalid unless it is justified by a compelling governmental interest and is narrowly tailored to advance that interest. *Id.* at 533, 113 S.Ct. 2217. However, a neutral law of general applicability does not implicate the Free Exercise Clause even if the law has the incidental effect of burdening a particular religious practice. *Id.* at 531, 113 S.Ct. 2217; *Smith*, 494 U.S. at 876–77, 110 S.Ct. 1595("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate.").

▮▮▮▮ The Regulations at issue in this case are clearly neutral laws of general applicability. They prohibit vertical decorations of any kind—secular or religious—in the newer sections of the Cemetery. Moreover, contrary to the plaintiffs' allegations, there is no evidence that the Regulations were crafted to suppress religious expression. Accordingly, the Free Exercise Clause affords the plaintiffs no basis for challenging the City's Regulations.[12]

The Court's conclusion that the City's Regulations do not violate the Free Exercise Clause is bolstered by the Supreme Court's decision in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). In *Lyng*, three Native American tribes in northwestern California challenged the United States Forest Service's decision to permit forest harvesting in, and construct a road through, a portion of a National

duty of the judicial department to say what the law is.").

12. In *Smith*, 494 U.S. at 881–82, 110 S.Ct. 1595 the Supreme Court explained *in dicta* that an individual may be relieved of the obligation to comply with a neutral law of general applicability where free exercise concerns are implicated along with other constitutional protections such as freedom of speech and of the press. The plaintiffs contend that *Smith* requires strict scrutiny in such cases and that because this case implicates not only religious conduct but also religious speech, the prohibition on vertical grave decorations is subject to strict scrutiny. The Court disagrees.

Initially, it is not clear whether the *Smith* Court's pure free exercise versus hybrid claim distinction is tenable. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 567, 113 S.Ct. 2217 (Souter, J. concurring) ("[T]he distinction *Smith* draws strikes me as ultimately untenable. If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the *Smith* rule, and indeed, the hybrid exception would cover the situation exemplified by *Smith*, since free speech and associational rights are certainly implicated by the peyote ritual."). In any event, the Court does not read *Smith* to require strict scrutiny whenever a plaintiff presents a hybrid claim. Rather, the fact that the City's Regulations burden speech as well as religious exercise means only that the City's Regulations must be analyzed under the Free Speech Clause as well as under the Free Exercise Clause.

Forest used by the tribes for religious worship. *Id.* at 442–43, 108 S.Ct. 1319. The evidence put on at trial established that the government's action would seriously impair the tribes' use of the forest for religious practices. *Id.* at 443–44, 451, 108 S.Ct. 1319. *See also Northwest Indian Cemetery Protective Ass'n v. Peterson,* 565 F.Supp. 586, 594 (N.D.Cal.1983). Nevertheless, the *Lyng* Court concluded that the tribes did not have a cognizable claim under the Free Exercise Clause.

The basis for the Court's holding was that:

> The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens ... The Free Exercise Clause affords an individual protection from certain forms of government compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures.

*Lyng,* 485 U.S. at 448, 108 S.Ct. 1319. The Court concluded that the Free Exercise Clause "does not divest the Government of its right to use what is, after all, its land." *Id.* at 453, 108 S.Ct. 1319. *See also Miccosukee Tribe v. United States,* 980 F.Supp. 448, 464–65 (S.D.Fla.1997) (holding that the government did not violate the Free Exercise Clause by failing to prevent flooding on Native American lands).

In *Lyng,* the government took action to improve its National Forest. The fact that the action burdened the tribes' religious practices did not implicate the Free Exercise Clause. Similarly, in this case the City enacted Regulations to improve its Cemetery. The fact that these Regulations may interfere with the plaintiffs' religious practices does not implicate the Free Exercise Clause.[13]

 The fact that the plaintiffs in this case, unlike the plaintiffs in *Lyng,* have a limited property interest in their Cemetery plots does not alter the foregoing analysis. It is well settled that "one who purchases and has conveyed to him a lot in a public cemetery does not acquire the fee to the soil, but only a right of burial therein which has been variously designated as an easement or as a licence or privilege." 14 AM. JUR.2d *Cemeteries* § 25 (1964) (and cases cited therein). The plaintiffs' right of burial is subject to the express limitation in their Certificate of Ownership that the right "be used only in conformity with the Cemetery Rules and Regulations as they may be from time to time adopted or amended." Def.'s Ex. 7. Moreover, the Certificate of Ownership clearly states that the plot "shall forever remain under the exclusive control of the [City] for the purposes of care and maintenance." *Id.* Thus, the Cemetery is clearly government property which the City may manage as it sees fit. *Cf. Miccosukee Tribe,* 980 F.Supp. at 465 (applying *Lyng* analysis to tribes' free exercise challenge where tribes' property rights in land were subject to the government's lawful authority to manage the land). Accordingly, the plaintiffs' free exercise challenge fails under *Lyng.*[14]

---

**13.** The Court recognizes that the fact that the City's Regulations affirmatively prohibit conduct in the Cemetery may be a significant distinction in the case at bar. The *Lyng* Court did state that: "The crucial word in the constitutional text is 'prohibit'; For the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." *Lyng,* 485 U.S. at 451, 108 S.Ct. 1319. However, it is not clear what difference it makes whether the government in administering its land directly prohibits conduct through regulation or merely makes such conduct more difficult or impossible through its own action. For example, if the City, rather than prohibiting vertical grave decorations, had a policy of regularly removing structures that interfered with the aesthetic and maintenance requirements of the Cemetery, the "prohibitive effect" would be identical, and *Lyng* would clearly bar a free exercise challenge. Thus, to the extent *Lyng* stands for the proposition that the Free Exercise Clause cannot be used to challenge the government's administration of its own land, *Lyng* bars the plaintiffs' free exercise challenge.

**14.** As noted above, the Federal RFRA was enacted in response to the Supreme Court's

## 2. The Free Speech Claim

■ The Free Speech Clause of the First Amendment, which applies to the States through the Fourteenth Amendment, *see Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), provides that "Congress shall make no law ... abridging the freedom of speech." U.S. CONST. amend. I. "Private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). *See also Chabad–Lubavitch of Georgia v. Miller*, 5 F.3d 1383, 1387 (11th Cir.1993) ("Religious speech enjoys sanctuary within the First Amendment."). Moreover, the Eleventh Circuit has held that the display of religious symbols constitutes protected speech under the First Amendment. *Id.* (holding that the display of a Chanukah menorah constitutes religious speech under the First Amendment). Therefore, there can be no doubt that the display of religious symbols such as crosses and stars of David on grave sites constitutes religious speech protected independently under the Free Speech Clause.

### a. Sections IX(2) and XIV(2)

The plaintiffs contend that §§ IX(2) and XIV(2) of the Regulations which prohibit vertical grave decorations in the Cemetery violate the Free Speech Clause by unduly restricting religious expression. The Court disagrees.

■ It is well settled that the government need not permit all forms of speech on property that it owns and controls. *See Int'l Soc. for Krishna Consciousness v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). The Supreme Court has adopted a "forum-based" approach for assessing the consti-

tutionality of restrictions the government seeks to place on the use of its property. *Id.* Under this framework, regulation of speech on government property that has traditionally been available for public expression (i.e., a "public forum") or that has been designated by the government for public expression (i.e., a "designated public forum") is subject to strict scrutiny. *Id.* at 678–79, 112 S.Ct. 2701. Such regulations will survive only if they are narrowly tailored to achieve a compelling governmental interest. *Id.* at 679, 112 S.Ct. 2701. Regulation of speech on all other government property (i.e., a "nonpublic forum") is subject to much more limited review. *Id.* These regulations need only be reasonable and viewpoint neutral. *Id.*

■ A public forum is government property that has as "a principal purpose ... the free exchange of ideas." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Residential streets and parks have long been considered public fora because they have "immemorially been held in trust for the use of the public and ... have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Lee*, 505 U.S. at 679, 112 S.Ct. 2701. Other government property such as airport terminals are not considered public fora because their principal purpose is not to promote the free exchange of ideas but rather to facilitate passenger air travel. *Id.* at 682, 112 S.Ct. 2701; *Iskcon Miami Inc. v. Metropolitan Dade County*, 147 F.3d 1282, 1286 (11th Cir.1998).

■ The Court is aware of no case considering whether cemeteries are public or nonpublic fora for purposes of free speech claims. *But cf. Koehl v. Resor*,

---

holding in *Smith*. The Florida RFRA was enacted in response to the Supreme Court's holding in *City of Boerne* declaring the Federal RFRA unconstitutional as applied to the states. To the extent the Florida RFRA is an attempt to codify pre-*Smith* free exercise ju-

risprudence, *Lyng*, decided two years before *Smith*, might compel a reading of the Florida RFRA that exempts the government's administration of its own land from the operation of the statute.

296 F.Supp. 558, 563 (E.D.Va.1969) (upholding regulations which barred Nazi Party's political demonstrations as well as signs, placards, banners, and other expressive conduct in Culpeper National Cemetery). Nevertheless, it seems quite obvious that cemeteries are nonpublic fora. It certainly cannot be said that cemeteries have traditionally been used for assembly and the free exchange of ideas. The primary purpose of cemeteries is not to facilitate the free exchange of ideas but, rather, to provide a place for citizens to bury and honor their dead. Accordingly, the Court concludes that the Cemetery is a nonpublic forum for First Amendment analysis.

■■■ Having determined that the Cemetery is a nonpublic forum, the Court must consider whether the City's prohibition on vertical grave decorations is viewpoint neutral and reasonable. A regulation is viewpoint neutral as long as it is "not an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Lee,* 505 U.S. at 679, 112 S.Ct. 2701. Moreover, a regulation "need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Id.* at 683, 112 S.Ct. 2701 [internal citations and quotations omitted].

■■■ Sections IX(2) and XIV(2) of the Regulations are clearly viewpoint neutral. They prohibit all vertical decorations—religious or otherwise—in the newer sections of the cemetery. Thus, these Regulations cannot be considered an attempt to stifle religious expression.[15]

Moreover, the Regulations are a reasonable way of promoting their primary objectives; namely to: 1) maximize the use of available Cemetery space; 2) allow ready access to all grave sites for burials and disinterments; 3) ensure ease of grounds maintenance; 4) ensure the safety of grounds keepers and visitors; and 5) maintain a uniform appearance and aesthetically pleasing environment in the Cemetery.

As noted above, the use of vertical grave decorations would permit fewer grave sites in the Cemetery, impede access to the grave sites, make grounds maintenance more difficult and dangerous for grounds keepers and visitors, and create visual clutter. The City's prohibition on vertical grave decorations is reasonable because it minimizes these concerns without wholly foreclosing the plaintiffs' ability to express themselves. The plaintiffs are free to express themselves through religious symbols or otherwise on the horizontal grave markers permitted by the Regulations.

The plaintiffs rely heavily on *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), in support of their free speech challenge. In *Gilleo,* a homeowner challenged a city ordinance which prohibited all residential signs except those falling within one of ten exemptions. *Id.* at 46, 114 S.Ct. 2038. The Court found that the ordinance violated the Free Speech Clause because it prohibited too much speech by completely foreclosing "a venerable means of communication that is both unique and important." *Id.* at 55, 114 S.Ct. 2038. The Court explained that "residential signs have long been an important and distinct medium of expression ... [that] may have no practical substitute." *Id.* at 55–57, 114 S.Ct. 2038. Moreover, the Court emphasized that a "special respect for individual liberty in the home has long been part of our culture and our law." *Id.* at 58, 114 S.Ct. 2038.

The plaintiffs' reliance on *Gilleo* is misplaced for two reasons. First, the *Gilleo* Court made clear that its holding was based on the notion that expression in the home is accorded special respect. *Id.* In fact, the Court explained that the government has broader power to regulate expression on public property. *Id.* ("Whereas the government's need to mediate

**15.** The plaintiffs suggest that the Regulations are not viewpoint neutral because they apply to a place where the only foreseeable kind of expression is religious in nature. The Court

disagrees. Expression on grave sites is often secular in nature. For example, graves are often decorated with flags or war memorials as an expression of patriotism.

among various competing uses, including expressive ones, for public streets and facilities is constant and unavoidable, its need to regulate temperate speech from the home is surely much less pressing.") [citations omitted]. *See also Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 811, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (upholding city ordinance that prohibited the posting of signs on public property but noting that a "private citizen's interest in controlling the use of his own property justifies ... disparate treatment."). As noted above, the Cemetery is government property and, therefore, *Gilleo* is inapposite.

Second, unlike in *Gilleo,* the prohibition on vertical grave decorations does not foreclose an entire medium of expression. The Regulations do not prohibit all symbols on grave sites. Rather, they only prohibit vertical symbols. The plaintiffs are free to express themselves by placing any symbol they wish on the horizontal grave markers permitted by the Regulations.

For the foregoing reasons, the Court concludes that §§ IX(2) and XIV(2) of the Regulations do not violate the Free Speech Clause of the First Amendment.

### b. Section XVI(1)

█ The plaintiffs also contend that Section XVI(1) of the Regulations violates the First Amendment by vesting the Cemetery Manager with unbridled discretion to allow temporary exceptions to the prohibition on vertical grave decorations. The Court agrees.

It is well settled that:

an ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Miami Herald Publ'g Co. v. City of Hallandale,* 734 F.2d 666, 673 (11th Cir.1984)

(*quoting Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Moreover, an exception or variance is the equivalent of a license under this analysis. *See Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1361 (11th Cir.1999).

█ Such prior restraints are impermissible because they give "a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). Thus, in order to survive a First Amendment challenge, a licensing or variance scheme which gives public officials the power to decide whether to permit expressive activity must: 1) contain precise and objective criteria for decisionmaking; and 2) require prompt decisions. *See Lady J. Lingerie,* 176 F.3d at 1361.

The City's Regulations, while enacting a virtual blanket prohibition on vertical grave decorations, also provide:

The Cemetery Manager, after consultation with the Recreation Services Department Director, reserves the right to make temporary exceptions, suspensions and modification [sic] of any rule or regulation, *when in the Cemetery Manager's discretion, such modification seems advisable.* Such temporary exceptions, suspensions and modifications shall in no way be construed as effecting [sic] the general enforcement of these rules and regulations nor as eliminating the authority of the City Council in approving or disapproving all permanent changes in the rules or policies of the Cemetery/Mausoleum.

Regulations § XVI(1) [emphasis added]. The plain language of this Regulation vests the Cemetery Manager with unbridled discretion to allow temporary exceptions to the prohibition on vertical grave decorations. The Regulation provides no objective criteria for granting a temporary exception. Nor does the Regulation provide

a time frame during which the Cemetery Manager must make a decision. Thus, the Regulation provides the Cemetery Manager with the power to discriminate on the basis of content. For example, a Cemetery Manager partial to the Christian faith could allow an exception for crosses while refusing an exception for stars of David. This opportunity to discriminate is prohibited by the First Amendment.[16] *See Forsyth County v. Nationalist Movement,* 505 U.S. 123, 133 n. 10, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("The success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decision maker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance prohibiting him from doing so."). Accordingly, the Court finds that § XVI(1) of the Regulations is unconstitutional as applied to the prohibition on vertical grave decorations.

■ If an unconstitutional provision of a statutory scheme is severable, a court should not invalidate the entire scheme. *See Regan v. Time, Inc.,* 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) ("[A] court should refrain from invalidating more of the statute than is necessary."). "In determining whether to sever a constitutionally flawed provision, courts should consider whether the balance of the legislation is incapable of functioning independently," *United States v. Romero–Fernandez,* 983 F.2d 195, 196 (11th Cir.1993), and whether partial invalidation of the statute "would be contrary to legislative intent in the sense that the legislature would not have passed the statute without the invalid portion." *Smith v. Butterworth,* 866 F.2d 1318, 1321, (11th Cir.1989), *aff'd,* 494 U.S. 624, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990).

■ Section XVI(1) is clearly severable from the remainder of the Regulations. Absent this provision, the Regulations flatly prohibit vertical grave decorations subject only to the exceptions expressly provided for in § IX(2). Moreover, the City would undoubtedly have enacted the prohibition on vertical grave decorations without the invalid portion of the Regulations.

Accordingly, the Court finds that § XVI(1) of the Regulations is unconstitutional as applied to the prohibition on vertical grave decorations. The Regulations are otherwise valid under the First Amendment. Partial judgment will be entered in favor of the plaintiffs as to count II of the amended complaint.

**C. Count III—The Due Process Clause of the Fourteenth Amendment**

In count III of their amended complaint, the plaintiffs contend enforcement of the challenged Regulations would deprive them of a property interest in maintaining vertical grave decorations on their Cemetery plots in violation of the Due Process Clause of the Fourteenth Amendment. The Court disagrees.

The Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty or property without due process of law." U.S. CONST. amend. XIV, § 1. "The Fourteenth Amendment's ... protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The *Roth* Court explained that:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it ... Property interests, of course, are not created by the Constitution. Rather they are

---

**16.** The fact that the Regulations only grant the Cemetery Manager the discretion to allow temporary exceptions to the prohibition on vertical grave decorations does not alter the foregoing analysis. A temporary constitutional violation is nevertheless a constitutional violation.

created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. 2701. *See also Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) ("the sufficiency of the claim of entitlement must be decided by reference to state law.").

The plaintiffs do not have a property interest under Florida law in maintaining vertical grave decorations on their Cemetery plots. To the contrary, as noted above, the plaintiffs' limited property interest in their plots is subject to the express limitation in their Certificate of Ownership that the plots be used only in conformity with the Regulations which expressly prohibit vertical grave decorations.

The plaintiffs contend nevertheless that a constructive property interest arose by virtue of the fact that they were permitted to maintain vertical grave decorations in violation of the Regulations for several years. The plaintiffs testified that they either: 1) received permission from the Cemetery Manager to maintain vertical grave decorations; or 2) were told by the Cemetery Manager that the prohibition on vertical grave decorations was never enforced. The plaintiffs contend that in light of the City Managers' conduct, the City is estopped from applying its Regulations.

It is well settled in Florida that no property interest arises from the unauthorized acts of municipal officers. *See Miami Shores Village v. Brockway Post No. 124 of American Legion,* 156 Fla. 673, 24 So.2d 33, 35 (1945), *overruled on other grounds by Sakolsky v. City of Coral Gables,* 151 So.2d 433 (Fla.1963) ("Generally speaking, a permit issued ... in violation of law confers no right or privilege on the grantee."). *Cf. Brett v. Jefferson County,* 123 F.3d 1429, 1434 (11th Cir. 1997) (holding that a property interest contrary to state law cannot arise by informal custom). Accordingly, "no estoppel can be

sustained against a municipality under such circumstances." *Enderby v. City of Sunrise,* 376 So.2d 444, 445 (Fla. 4th DCA 1979) (*quoting United Sanitation Services, Inc. v. City of Tampa,* 302 So.2d 435, 438 (Fla. 2d DCA 1974). To the extent the Cemetery Manager permitted the plaintiffs to maintain permanent vertical grave decorations on their Cemetery plots, he did so in violation of the Regulations. Accordingly, the plaintiffs have no property interest in maintaining vertical grave decorations in the Cemetery, and the City is not estopped from enforcing the Regulations.

The plaintiffs, relying on *Buccaneer Point Estates, Inc. v. United States,* 729 F.2d 1297 (11th Cir.1984), also contend that enforcement of the Regulations would result in a "manifest injustice." The plaintiffs' reliance on *Buccaneer Point* is misplaced.

In *Buccaneer Point,* a developer completed 80% of a project to build 200 residences, proceeding on the written assurances of the Army Corps of Engineers and upon existing regulations which provided that the work could proceed. *Id.* at 1298–1299. Thereafter, new regulations were adopted which impeded the project. *Id.* The developer brought an action for declaratory and injunctive relief, and the Eleventh Circuit held that the retroactive application of the regulations to the developer's project would result in a "manifest injustice" because it would interfere with the developer's justified reliance on existing regulations. *Id.* at 1299–1300. In this case, however, the plaintiffs violated the existing Regulations at the time they placed the vertical decorations on their Cemetery plots. Moreover, while the City did agree to postpone enforcement of the prohibition on vertical grave decorations for several years while the Regulations were being studied, the City at all times made clear that the stay on enforcement was temporary, and the plaintiffs were on notice that unless the City chose to change its policy regarding vertical grave decora-

tions, the Regulations would eventually be enforced. Accordingly, the plaintiffs do not have a justified reliance interest in maintaining their vertical grave decorations, and no "manifest injustice" will result from requiring the plaintiffs to comply with the Regulations which have governed the Cemetery since before the plaintiffs bought their plots.

Thus, the plaintiffs have failed to establish a due process claim. Judgment will be entered in favor of the City as to count III of the plaintiffs' amended complaint.

### D. Count IV—The Florida Constitutional Claims

In count IV of their amended complaint, the plaintiffs contend that the prohibition on vertical grave decorations violates their guarantees under the Florida Constitution to freedom of religious exercise, freedom of speech and due process of law. *See* FLA. CONST. art. I, §§ 3, 4 & 9. Florida courts have generally construed their state constitutional guarantees to be coextensive with their federal counterparts. *See, e.g., Florida Canners Ass'n v. State Dept. of Citrus,* 371 So.2d 503, 513, 517 (Fla. 2d DCA 1979), *aff'd sub nom, Coca-Cola Co. v. State Dept. of Citrus,* 406 So.2d 1079 (Fla.1981) (applying federal standard to state due process and free speech claims). Accordingly, for the reasons provided above, the Court finds that the City's prohibition on vertical grave decorations does not violate any provision of the Florida Constitution. However, § XVI(1) of the Regulations is unconstitutional as applied to the prohibition on vertical grave decorations. *See* § B(2)(b) *supra.* Partial judgment will be entered in favor of the plaintiffs as to count IV of the amended complaint.

### III. *CONCLUSION*

On the basis of the foregoing, the Court concludes that the Rules and Regulations of the Boca Raton Municipal Cemetery which prohibit vertical grave decorations on Cemetery plots do not violate the plaintiffs' federal or state guarantees of freedom of religious exercise, freedom of

speech or due process of law. However, § XVI(1) of the Regulations violates the Free Speech Clauses of both the federal and Florida Constitutions as applied to the prohibition on vertical grave decorations. Final judgment will be entered by separate order.