John MACK, Plaintiff–Appellant,

v.

Michael O'LEARY, et al., Defendants–Appellees.

John Lee LIPSCOMB–BEY, Plaintiff–Appellant,

v.

Howard A. PETERS III, et al., Defendants–Appellees.

Nos. 95–1331, 94–1849.

United States Court of Appeals, Seventh Circuit.

Submitted Feb. 29, 1996.

Decided April 3, 1996.

John Mack (submitted), Danville, IL, Plaintiff-Appellant pro se.

Alison E. O'Hara, Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendants-Appellees Michael F. O'Leary, Salvador A. Godinez, J. Springborn, James M. Schomig.

John L. Lipscomb-Bey (submitted), Pontiac, IL, Plaintiff-Appellant pro se.

Jessie Wang-Grimm, Office of the Attorney General, Chicago, IL, for Defendants-Appellees Howard A. Peters, III, George C. Welborn, Alan L. Frentzel, Leo Hayes.

Before POSNER, Chief Judge, and MANION and KANNE, Circuit Judges.

POSNER, Chief Judge.

We have consolidated for decision appeals by two Illinois state prisoners from the dismissal of their suits against prison officials in which they seek damages for alleged infringements of religious liberty. The appeals require us to consider for the first time the meaning of the term "substantially burden a person's exercise of religion," which is the key term in the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb.

*No. 95–1331.* Ramadan is a 30–day period, analogous to Lent, but much more rigorous, during which votaries of Islam are required to engage in fasting and other prescribed acts of abstinence and in which ritual duties, including prayer and purification, are to be discharged with the utmost punctiliousness. According to Mack's complaint, the factual allegations of which we must accept because the suit was dismissed for failure to state a claim, the defendants during Ramadan 1992 and 1993 refused to accommodate the religious needs of Mack and the other Muslim inmates of Stateville prison. The Muslims were forced to have their dinner (a ritual occasion during Ramadan, because fasting is required from sunrise to sunset) in the prison's mess hall immediately after the rest of the prison population had had its dinner. So there was no time to clean the floor, which was filthy from the previous diners, and as a result the Muslims were unable to prostrate themselves for prayer during the prayer intervals in their meal. The manner in which the tables in the mess hall were bolted to the wall, moreover, made it impossible for the diners to sit facing Mecca or to pray in the prescribed close formation. And because the mess hall lacked running water, the diners could not perform ritual purification *(wudu)* during their meals, which might become necessary if a diner defiled himself during the meal, for example by breaking wind.

The district judge did not think that these allegations demonstrated a substantial burden on the Muslims' exercise of their religion. "The alleged restrictions imposed by the physical limitations of the facility may interfere with the desired method of prayer," he said, "but the restrictions do not trespass upon Mack's ability to retain and worship the principle that is central to Islam." In support of the judge's ruling, the defendants ask us to distinguish between a substantial burden and a mere inconvenience, and they argue that what Mack alleges is clearly the latter.

Mack is seeking only damages by way of relief, and has named only prison officials, and not the State of Illinois, as defendants. The defendants do not raise a defense of qualified immunity. They also do not question the propriety of damages as a remedy for violations of the Act, even though the Religious Freedom Restoration Act says nothing about remedies except that a person whose rights under the Act are violated "may assert that violation as a claim or defense in a judicial proceeding and obtain *appropriate* relief against a government." 42 U.S.C. § 2000bb–1(c) (emphasis added). (Previous decisions have assumed rather than discussed the availability of damages under the Act. See, e.g., *Brown v. Hot, Sexy & Safer Productions, Inc.*, 68 F.3d 525, 537–38 (1st Cir.1995).) Although there is no indication of congressional intent to abrogate the states' Eleventh Amendment immunity from suit (another issue not discussed in previous cases), the Act defines "government" to include government employees acting under color of state law. § 2000bb–2(1). So Mack was entitled to sue the prison officials rather than the State of Illinois and does not face the bar of the Eleventh Amendment.

*No. 94–1849.* Lipscomb–Bey (who unlike Mack sought injunctive relief as well as damages in the district court) belongs to a religious sect known as the Moorish Science Temple of America. "Moors," as the adherents to the sect are known, celebrate January 8, the birthday of their founder, Drew Ali, with a Prophet's Day banquet. The Moors imprisoned in Menard requested but were refused permission to have such a banquet. The prison has grouped the more than 300 religious denominations represented at Menard (a number hard to believe, but not contested) into four umbrella groups—Catholic, Jewish, Muslim, and Protestant—each of which is allowed one or two picnic days a year, which they can use for a sacred feast. No separate denomination is allowed its own

picnic day. The prison classifies the Moors as Muslims, but they are pretty *sui generis.* They have a sacred book that they call the "Koran," but it is not the Islámic Koran, and while they respect Mohammed, along with Jesus and others, as prophets, they give primacy to their own prophet, Drew Ali. They are permitted to and do conduct their own religious services at Menard.

Lipscomb-Bey, unlike Mack, was given an evidentiary hearing on his claim that his religious rights were infringed by the refusal to allow the Moors to hold a banquet. At the hearing, the national leader of the Moors, Grand Sheikh Robert Love–El, testified that a Prophet's Day banquet was an important but not a required rite of the Moorish Science Temple. Officials of Menard testified that it would be utterly impractical to allow each of the 300 denominations to have its own feast day. The district court gave judgment for the defendants.

The Religious Freedom Restoration Act provides that "government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The Supreme Court had held in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), that a law of general applicability (there a law, similar to the federal drug laws, regulating the sale and use of certain "controlled substances") can be enforced against religiously motivated conduct (there the use of peyote as part of the religious rituals of an American Indian tribe) without infringing the free exercise clause of the First Amendment. The Act, the constitutionality of which is not questioned in either of these cases (and see *Flores v. City of Boerne,* 73 F.3d 1352 (5th Cir.1996), upholding the Act as a valid exercise of Congress's powers under section 5 of the Fourteenth Amendment)—or its applicability to prison inmates (see, e.g., *Hamilton v. Schriro,* 74 F.3d 1545, 1552 (8th Cir. 1996))—enlarges the free-exercise right beyond the constitutional bounds set forth in *Smith.* "Congress by RFRA is demanding

ad hoc review of laws of general applicability that substantially burden the free exercise of religion" but do not violate the Constitution as authoritatively interpreted in *Smith. Flores v. City of Boerne, supra,* 73 F.3d at 1361.

How far beyond? That is the question, and the circuits have answered it in different ways. The Fourth, Ninth, and Eleventh Circuits define "substantial burden" as one that either compels the religious adherent to engage in conduct that his religion forbids (such as eating pork, for a Muslim or Jew) or forbids him to engage in conduct that his religion requires (such as prayer). *Goodall by Goodall v. Stafford County School Board,* 60 F.3d 168, 172–73 (4th Cir.1995); *Cheffer v. Reno,* 55 F.3d 1517, 1522 (11th Cir.1995); *Bryant v. Gomez,* 46 F.3d 948 (9th Cir.1995) (per curiam). The Eighth and Tenth Circuits use a broader definition—action that forces religious adherents "to refrain from religiously motivated conduct," *Brown–El v. Harris,* 26 F.3d 68, 70 (8th Cir.1994), or that "significantly inhibit[s] or constrain[s] conduct or expression that manifests some central tenet of a [person's] individual beliefs," *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir.1995), imposes a substantial burden on the exercise of the individual's religion. The Sixth Circuit seems to straddle this divide, asking whether the burdened practice is "essential" or "fundamental," *Abdur–Rahman v. Michigan Dept. of Corrections,* 65 F.3d 489, 491–92 (6th Cir.1995).

■ These verbal differences may be accidental, or may come to nothing in practice. None of the cases that we have cited expresses an awareness of an intercircuit split; nor is it clear that any of the holdings (as distinct from many of the dicta) are inconsistent. But we do think that the more generous definition is more faithful both to the statutory language and to the approach that the courts took before *Smith,* in cases like *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Thomas v. Review Board,* 450 U.S. 707, 717–18, 101 S.Ct. 1425, 1431–32, 67 L.Ed.2d 624 (1981)—which is the approach that Congress wanted them to take under the Religious Freedom Restoration Act. 42 U.S.C. § 2000bb(b)(1); see also

S.Rep. No. 111, 103d Cong., 1st Sess. 5–9 (1993); H.R.Rep. No. 88, 103d Cong., 1st Sess. 2–7 (1993) U.S. Code Cong. & Admin. News 1993 pp. 1892, 1894-1899. We hold, therefore, that a substantial burden on the free exercise of religion, within the meaning of the Act, is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenet of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs.

What we are calling the generous definition is also the one more sensitive to religious feeling. Many religious practices that clearly are not mandatory, such as praying the rosary, in the case of Roman Catholics, or wearing yarmulkes, in the case of Orthodox Jews (optional because while Jewish men are required to cover their heads, the *form* of the head covering is not prescribed), are important to their practitioners, who would consider the denial of them a grave curtailment of their religious liberty.

But the decisive argument in favor of the generous definition of "substantial burden," it seems to us, is the undesirability of making judges arbiters of religious law, *Thomas v. Review Board, supra,* 450 U.S. at 716, 101 S.Ct. at 1431; *Reed v. Faulkner,* 842 F.2d 960, 963 (7th Cir.1988), as required by the alternative approach. That approach, the approach of the Fourth, Ninth, and Eleventh Circuits, requires the courts to determine what practices the plaintiff's religion obligates him to follow, and this is an issue of religious law, requiring the court to determine the authoritative sources of law for the religion in question and to interpret the commands emanating from those sources. In the case of hierarchical religions such as Roman Catholicism this process of identification and interpretation, which resembles the procedures of legal positivism, is feasible. In the case of nonhierarchical religions, however, such as Islam, Judaism, and a multitude of Protestant sects, the process is infeasible, or at least very difficult and attended with a high degree of indeterminacy. The danger that courts will find themselves taking sides in religious schisms, if they must opine on matters of religious obligation, is not a trivial one.

■ The other approach, the approach that does not tie burden on religion to religious law, is not immune from the danger of putting judges into the awkward position of taking sides in religious controversies—a danger that was one of the things that persuaded the Supreme Court in *Smith* to abandon the approach as a matter of constitutional interpretation. 494 U.S. at 886–87, 110 S.Ct. at 1604–05. For it requires the court to separate center from periphery in religious observances. But that is an inquiry sociological rather than legal in character and the risk of taking sides in religious controversies is less. A court should be able to figure out, usually from its own observations ("common knowledge") but if need be from evidence, which religious practices are important to their practitioners and which are not without having to determine who in the religion is authorized to lay down dogma and what the content of that dogma is. Under the 27–year regime overturned in *Smith* the courts did not encounter insuperable difficulties in determining the importance of the various practices the burdening of which was claimed to be substantial. See, e.g., *Wisconsin v. Yoder,* 406 U.S. 205, 215–19, 92 S.Ct. 1526, 1533–35, 32 L.Ed.2d 15 (1972); *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 451, 108 S.Ct. 1319, 1326–27, 99 L.Ed.2d 534 (1988); *Young v. Lane,* 922 F.2d 370, 376–77 (7th Cir.1991). All this is not to deny that when it is known without need for judicial inquiry that the practice in question either is or is not mandatory, this adds weight to, or subtracts weight from, the substantiality of the burden. See, e.g., *Menora v. Illinois High School Ass'n,* 683 F.2d 1030, 1034 (7th Cir.1982). But it does not conclude the issue.

■ Mack's case illustrates the superiority of the broader definition of substantial burden. It would be an exquisitely difficult undertaking for a court to determine whether the practices that he claims the defendants interfered with, such as facing Mecca while eating Ramadan meals or purifying oneself during as well as before the meals, are actually obligatory for Muslims. There

are different branches of Islam, of which the Sunni and the Shiite are merely the best known, so that the court would first have to determine which branch the plaintiff considered himself to be a member of. And neither branch has a supreme leader, corresponding to the Pope or to the Patriarch of the Russian Orthodox Church, to whom a court might look for a definitive ruling on a subtle or contested article of faith. The proper and feasible question for the court is simply whether the practices in question are important to the votaries of the religion, and being factual that is not a question that can usually, or here, be resolved on the pleadings. Mack has stated a claim by alleging that the defendants have substantially burdened the exercise of his religious rights. A remand will be necessary in his case to determine whether the claim has merit.

■■ We do not think that this conclusion portends a flood of prisoner litigation that will make the management of American prisons even more difficult than it is already. Although once a substantial burden on the plaintiff's practice of the religion is shown the burden shifts to the defendant to show that the state has a compelling interest in imposing the burden and could not protect that interest by some less burdensome means, we find nothing in this formulation, or in the history of the statute, to suggest that Congress intended to undermine the judicial policy of deference to prison authorities on issues of prison discipline. *Hamilton v. Schriro, supra,* 74 F.3d at 1552. On the contrary, the legislative history is explicit in recognizing that the interest in maintaining order in prisons is a compelling governmental interest and one that frequently requires and so justifies limitations on freedom of religious conduct. As the House Report put it, "religious liberty claims in the context of prisons and the military present far different problems for the operation of those institutions than they do in civilian settings. Ensuring the safety and orderliness of penological institutions, as well as maintaining discipline in our armed forces, have been recognized as governmental interests of the highest order." H. Rep. No. 88, *supra,* at 8. The Senate Committee said that it "expects that the courts will continue the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." S.Rep. No. 111, *supra,* at 10 U.S. Code Cong. & Admin. News 1993 at 1900 (footnote omitted).

■ It would be premature to decide whether the defendants in Mack's case were justified in restricting the religious observances of their Muslim prisoners as they did, because they have not as yet attempted to justify them. But it is fairly obvious that tables in prison mess halls have to be bolted to the floor, since they would be formidable weapons in a prison riot, and that alternative eating places may not be available for festal occasions such as Ramadan or Christmas dinners. The prison officials do not have to do handsprings to accommodate the religious needs of inmates, and the less central an observance is to the religion in question the less the officials must do.

■ These points are further illustrated by Lipscomb's case. We know from Grand Sheikh Love–El's testimony that the Moors at Menard are not strictly required by their religion to hold a Prophet's Day banquet, that it is enough to attend services on or about January 8 celebrating the Prophet's birthday. This is not conclusive against a violation of the Act if we are right that the practice of a religion can be substantially burdened by the curtailment of a nonmandatory observance. The Grand Sheikh's testimony indicates that a Prophet's Day banquet is an important though not absolutely essential rite for Moors, and hence that the refusal to allow the banquet did impose a substantial burden on Lipscomb–Bey's religious freedom. But the defendants overcame the prima facie case thus made out by establishing both a compelling governmental interest in imposing the modest burden and the absence of any less restrictive alternative. If not every one of the 300 denominations said to be represented at Menard, then undoubtedly a large fraction of them, could make a persuasive case that a periodic communal meal of some sort is a rite of their religion. From

the Jewish Seder (which was also Jesus Christ's last supper) to the Ramadan meals in Mack's case, communal eating is a standard rite in many religions. Menard cannot sponsor 300 banquets a year, or even 100. Its grouping of the denominations into four umbrella groups for purposes of festal occasions is all that the law could reasonably be thought to require of so religiously heterogeneous a prison. Lipscomb–Bey raises some other issues, but they do not have enough merit to warrant discussion. The judgment in his case must be affirmed.

■ But we must still tie up some loose ends in Mack's case. The complaint alleges that in addition to violating the Religious Freedom Restoration Act, the defendants denied the Muslim prisoners equal protection of the law by being much more accommodating of the needs of Christian prisoners. This part of the suit is based not on the Act, but on 42 U.S.C. § 1983, which creates a tort remedy against persons who infringe constitutional rights under color of state law. The district judge did not mention the equal protection claim and it is not obvious on what basis it could be rejected on the bare pleadings. The judge was right to dismiss so much of the suit as seeks damages under section 1983 from the defendants in their official rather than individual capacities, because such a claim is barred by the Eleventh Amendment (the defendants did interpose the Eleventh Amendment as a defense to Mack's equal protection claim, though not with respect to his claim under the Religious Freedom Restoration Act), and also right to dismiss so much of the suit as seeks relief under the free-exercise clause of the First Amendment rather than under the Act, since *Smith* bars the former.

■ What we described as the equal protection claim, however, could equally well be described as a claim under the free-exercise clause, which forbids government to discriminate between religions, *Reed v. Faulkner, supra,* 842 F.2d at 962; and so the First Amendment is not entirely out of the case. We are mindful of occasional judicial language to the effect that the Act "superseded" or "overturned" the understanding of the free-exercise clause expressed in *Smith* and some other First Amendment cases—notably *O'Lone v. Shabazz,* 482 U.S. 342, 107 S.Ct.

2400, 96 L.Ed.2d 282 (1987), which allowed prison officials to restrict religious observances by prisoners without showing a compelling interest, impossible to protect by a less restrictive means, for doing so. *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir. 1995); *Werner v. McCotter, supra,* 49 F.3d at 1479. But a statute cannot either enlarge or contract the Constitution. Nor do the defendants in these cases argue that the statute is intended to provide the exclusive means (exclusive, that is, of 42 U.S.C. § 1983, the usual vehicle for seeking civil relief against constitutional violations) for enforcing rights conferred by the free-exercise clause, as the Education of the Handicapped Act was held to do in *Smith v. Robinson,* 468 U.S. 992, 1009–13, 104 S.Ct. 3457, 3466–69, 82 L.Ed.2d 746 (1984), with respect to certain equal protection claims. The Religious Freedom Restoration Act says very little about remedies, so it is unlikely that Congress intended it to displace the existing remedial system for constitutional violations, but in any event such displacement is not argued.

The judgment in Mack's case (No. 95–1331) is affirmed in part (the part based on the Eleventh Amendment), but is otherwise reversed and his case remanded for further proceedings consistent with this opinion. The judgment in Lipscomb–Bey's case (No. 94–1849) is affirmed in its entirety.