**Paul Kay CORONEL, Plaintiff,**

v.

**Richard PAUL, et al., Defendants.**

**No. CIV–01–2222–PHX–ROS.**

United States District Court,
D. Arizona.

April 20, 2004.

Paul Kay Coronel, Florence, AZ, pro se.

Daniel Patrick Struck, Sonia Inez Krainz, Rebecca Smith Masterson, Jones, Skelton & Hochuli PLC, Phoenix, AZ, for Defendants.

## ORDER

SILVER, District Judge.

*Pro se* Plaintiff Paul Kay Coronel, an inmate at the Florence Correctional Center, brings this action against Defendants Richard Paul, Frank Luna, and Corrections Corporation of America ("CCA"), for alleged violations of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, and the Free Exercise Clause. Pending before the Court are Plaintiff's Motion for Summary Judgment; Defendants' Cross Motion for Summary Judgment; Plaintiff's Motion for Sanctions; and Defendants' Motion to Strike. For the reason stated below, the Motions are denied.

## BACKGROUND

### A. Facts

### 1. The Parties

Paul Kay Coronel ("Coronel") is a Hawaii state prisoner confined at the Florence Correctional Center ("FCC") in Florence, Arizona, a private prison operated by CCA. (Defendants' Statement of Facts ("DSOF") ¶¶ 1–2 [Doc. # 66].) Frank Luna is FCC's warden. (*Id.* ¶ 5.) Richard Paul is the prison's chaplain. (*Id.*)

## 2. Dianic Paganism

Coronel is a Dianic pagan.[1] (Affidavit of Paul K. Coronel ("Coronel Aff.") ¶ 2 [Doc. # 61].) According to literature produced by Coronel in discovery and submitted by the Defendants in connection with their Cross Motion, Dianics worship the goddess Diana, a personification of nature. (*Modern Day Dianic Practice* at 3, attached as Exh. 4 to DSOF.) They seek to understand and enjoy "[n]ature's full assets and capabilities." (*Id.* at 4.) They search for "eternal truths that answer life's questions," and their "worship of Diana, the Goddess of nature and all forces, helps [them] to live in harmony with these forces and with one another." (*Id.* at 1.)

Dianics place a strong emphasis on the role of women in their worship (*Id.* at 6.) They view women "as direct-lineage daughter of Diana possessing divine intelligence and capabilities," and they "agree with . . . Socrates that a woman's talent is not at all inferior to a man's." (*Id.*) As such, they give "special recognition to [women] and those special abilities they bring to the world." (*Id.*) But they also believe that "[a]ll life derives from and shares the essence of Goddess Diana." (*Id.*) Thus, "[a]ll men, women, and children are equals and all have been empowered from the Goddess." (*Id.*) "All are required to perpetuate the wonder of life and enjoy one another during the pursuit of life's pleasure principles." (*Id.*)

Evolution also plays an important role in the Dianic system. Dianics believe that "Diana is the evolved Goddess of the pre-Judaism families of religion where she was known by a variety of names including Isis, Rhea, Oestra, and others." (*Id.* at 1.) "This evolution continues today and includes the consolidation of all deities back into Diana, and combines the evolution of the nature of the Goddess with the evolutionary progress of technical discoveries [that enhance] our understanding of [the] natural forces of the universe[.]" (*Id.*) Dianics "do not claim to have all the answers to life and death, but [they] recognize these answers to be coming with the natural evolution of [their] religion[.]" (*Id.* at 6.)

Dianics have a moral code based on three elements: respect, pleasure, and responsibility. (*Id.* at 7.) Respect includes honoring nature and learning to live in harmony with it. (*Id.*) Pleasure is "the unique gift of Diana" and "a learned power capable of either constructive or destructive effects." (*Id.*) It is "the reward of responsible respect for Diana." (*Id.*) Responsibility involves "respecting the natural forces of the Universe (Diana), obtaining maximum pleasure, and contributing to evolution in some degree." (*Id.* at 8.) A responsible person contributes to the understanding and development of others, "producing pleasure and evolutionary progress for all persons individually, and for the society as a whole." (*Id.*)

Dianics practice their religion by "organizing local Dianic church circles, arranging worship schedules, selecting worship practices," and attending "religious-related events & festivals." (*Id.* at 9.) Dianic paganism is a dynamic faith and its practices "vary between individuals, as well as between individual Dianic church circles." (*Id.*) Some Dianics "share pleasures with one another in limitless responsible manners;" others enjoy "moonlight dancing;" others "give gifts to the Goddess and/or

---

**1.** The Defendants call Coronel a Dianic WICCAN, but do not define the term "WICCAN" or elaborate on the differences, if any, between a WICCAN and a pagan (DSOF ¶ 2.) Coronel asserts that WICCA is "an eclectic 'umbrella' for the worship of many different pagan religions." (Pl.'s Obj. to Def.'s Cross Mot. for Summ. J. and Reply in Supp. of Mot. for Summ. J. at 6 [Doc. # 69].)

those in need;" and others "share prayer-treatment/meditations and technical/evolutionary projects." (*Id.*) Worship includes many different activities—"living, loving, dancing, studying, singing, meditating, eating, giving, researching, creating are all forms of worship." (*Id.*)

## B. Coronel's Complaint

■ Coronel was transferred to FCC in early 2001. (Verified First Am. Compl. at 4 [Doc. # 10].[2]) There were no Dianic pagans at FCC at the time and no umbrella WICCA group existed. (*Id.*) Coronel says that he approached a group of Pasqua Yaqui Native Americans and asked to join what he calls "their pagan religious practices." (*Id.*) The Pasqua Yaquis allowed him to join. (*Id.*) According to Coronel, so did former Warden Pablo Sedillo and former Program Manager Chuirch.[3] (*Id.*) Coronel alleges that he then began worshiping with the group. (*Id.*) Around this time, native Hawaiians in FCC custody also practiced their "pagan religion" on FCC grounds.[4] (*Id.*)

In April 2001, Warden Sedillo and Program Manager Chuirch "were terminated," and Warden Frank Luna and Chaplain Richard Paul took over. (*Id.*) Coronel claims that Chaplain Paul refused to allow him to continue to worship with the Pasqua Yaquis. (*Id.*) He says that he later approached Paul and asked to arrange "some pagan practice." (*Id.* at Exh. A.) Paul advised him to join "the native Hawaiian pagan religious services." (*Id.* at 4.) Coronel claims that when he "approached the leader of the pagan Hawaiian religious group" and "requested to join," he " 'was informed . . . that Chaplain Richard Paul just ordered the termination of [that group].' " (*Id.* at 8)

Coronel alleges that he met with Warden Luna in a private office soon after meeting with Chaplain Paul. (*Id.* at 8.) He claims that Luna told him "of his experiences in establishing a WICCA group while he was warden of a CCA facility in Colorado" and that Luna promised to establish a WICCA group at FCC in the future. (*Id.*) Coronel says that he "patiently awaited Warden Luna's promised establishment of the WICCA group." (*Id.*) When no group was established, Coronel filed a grievance, appealed the denial, and then filed this action, alleging that the Defendants had banned all pagan religious exercise (*Id.*)

After Coronel filed his Complaint, a few FCC inmates converted to Dianic paganism and were allowed to practice with Coronel. (DSOF ¶ 12; Exh. 7 to Pl.'s Mot. for Summ. J.) Coronel, however, apparently still wishes to practice with the Pasqua Yaquis and the native Hawaiians. (*See* Pl.'s Mot. for Summ. J.) The Defendants admit that Coronel is not allowed to attend religious services with those groups. (Def.'s Resp. to Pl.'s Mot. for Summ. J. and Def.'s Cross Mot. for Summ. J. at 3; DSOF ¶ 5.) They claim that the Pasqua Yaquis and the native Hawaiians do not "practice any form of Coronel's religion" and that prison policy prohibits mixing

**2.** Coronel's First Amended Complaint is verified; an inmate's sworn pleadings are the equivalent of an affidavit and are sufficient to support or oppose a motion for summary judgment. *Keenan v. Hall*, 83 F.3d 1083, 1090 n. 1. (9th Cir.1996).

**3.** The Defendants assert that they are unable to determine whether Sedillo and Chuirch consented to such worship because "Warden Luna and Chaplain Paul were not present at the facility upon Plaintiff's arrival, and there are no records on religious turnout sheets available for that time period." (Def.'s Resp. to Pl.'s First Am. Request for Admissions ¶ 1, attached as Exh. 3 to DSOF.)

**4.** Coronel does not claim to be a native Hawaiian.

inmates from different jurisdictions (DSOF ¶¶ 7, 9.) In the Defendants' view, Coronel "simply seeks the right to associate with members of other religions[.]" (Def.'s Resp. to Pl.'s Mot. for Summ. J. and Def.'s Cross Mot. for Summ. J. at 4.)

Coronel claims that his desire to attend services with the Pasqua Yaquis and the native Hawaiians is religiously motivated. He argues that "the Pasqua Yaqui [N]ative American religion, and the native Hawaiian religion share the commonalty [*sic*] of all being historically established *pagan* religions." (Pl.'s Obj. to Def.'s Cross Mot. for Summ. J. and Reply in Supp. of Mot. for Summ. J. at 5 (emphasis in original)). He alleges that the Defendants have "isolated" him from "communal worship with fellow pagan practitioners, prohibiting the sharing of their common eclectic pagan rites, rituals, prayers, and other religious components common to all, and necessary to achieve meaningful satisfactory religious exercise[.]" (Verified First Am. Compl. at 9.) He further claims that inmates from different jurisdictions are in fact mixed at FCC and interact daily in the "recreational yard, medical, unit, halls, and at other locations." (Coronel Aff. ¶¶ 3–4.)

### C. Procedural History

Coronel filed his First Amended Complaint on January 31, 2002, alleging that the Defendants violated the RLUIPA and the Free Exercise Clause "by burdening and preventing [his] religious exercise." (Verified First Am. Compl. at 8 [Doc. # 10.]) The alleged violations consist of (i) Chaplain Paul's refusal to allow Coronel to participate in Pasqua Yaqui religious ceremonies, (ii) Paul's simultaneous "termination" of the native Hawaiian religious group, (ii) Warden Luna's "failure to halt" Paul's actions, (iii) Warden Luna's alleged failure to establish a WICCA program at

FCC, and (iv) Defendant CCA's alleged failure to train its employees to accommodate religious practices. (*Id.* at 8–9.)

■ Coronel moved for summary judgment on March 27, 2003. [Doc. # 61.] There is some ambiguity as to whether the Motion pertains only to Coronel's RLUIPA claim or to both his RLUIPA and Free Exercise Clause claim. Coronel repeatedly cites and discusses the RLUIPA but does not mention the Free Exercise Clause, except perhaps obliquely by a single reference to 42 U.S.C. § 1983. Because Coronel did not explicitly move on his Free Exercise Clause claim and because the Defendants have responded only to Coronel's RLUIPA claim, the Court construes the Coronel's Motion as pertaining only to the RLUIPA claim.

The Defendants responded to Coronel's Motion and cross-moved for summary judgment on Coronel's RLUIPA claim on April 24, 2003. [Doc. # 66.] The Defendants' Response and Cross Motion address primarily whether Coronel has met his burden of showing a substantial burden on his religious exercise within the meaning of the RLUIPA. In the event the Court finds that Coronel meets this burden, Defendants "request the right to address the argument that the burden was furthering a compelling state interest in a separate motion." (Defs.' Resp. to Pl.'s Mot. for Summ. J. and Defs.' Cross Mot. for Summary Judgment at n. 3.)

On May 5, 2003, the Court issued a *Rand* warning to Coronel.[5] [Doc. # 68.] The warning explained that the Defendants had moved for summary judgment, outlined Rule 56, and gave Coronel until May 30, 2003 to respond to the Defendants' Cross Motion. (*Id.*) On May 6, 2003, Coronel filed an Objection to Defen-

---

5. *See Rand v. Rowland,* 154 F.3d 952, 962–63 (9th Cir.1998) (holding that *pro se* prisoners

are entitled to fair notice of summary judgment rules).

dants' Cross Motion; a Reply in Support of his Motion for Summary Judgment; an Affidavit; a Statement of Facts; and a Motion for Sanctions under Rule 56(g).[6] [Doc. # 69.] One day later, he filed a "Supplemental Amendment" to his Motion and Reply and an "Amended Separate Statement of Facts." [Docs. # 70, 71.]

## DISCUSSION

### I. The Motion to Strike

▪ Defendants move to strike Coronel's "Supplemental Amendment" and "Amended Separate Statement of Facts." They argue that under Rule 15(d) of the Federal Rules of Civil Procedure a party may supplement a pleading only after filing a motion with the Court. (Def.'s Mot. to Strike at 1 [Doc. # 75].) The Court will deny the Motion. Coronel's papers are not pleadings, *see* Fed R. Civ. P. 7(a), and Defendants have given the Court no valid reason to strike them.[7]

### II. The Motions for Summary Judgment

#### A. Summary Judgment Standard

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Also, the dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *see Matsushita Elec, Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir.1995). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. However, because "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of a judge, ... [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995).

---

**6.** Coronel argues that the Defendants have filed an intentionally false and misleading affidavit. [Doc. # 70 at 3.]

**7.** A Court may, of course, decline to consider arguments raised for the first time in a reply brief. *United States v. Bohn,* 956 F.2d 208,

209 (9th Cir.1992). This rule does not apply here. Although Coronel calls his papers an "amendment" to his Motion for Summary Judgment and Reply in Support, they are in fact a response to issues raised in the Defendants' Cross Motion.

## B. Religion in the Prisons

### 1. Background: The Free Exercise Clause

Incarceration necessarily requires restrictions on some rights, but "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935(1974). Federal courts have long recognized that prisoners may bring constitutional claims, including those based on the First Amendment right to free exercise of religion. *See Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). This concern for religion stems in part from a belief in religion's redemptive powers. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 368, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) ("Incarceration by its nature denies a prisoner participation in the larger human community. To deny the opportunity to affirm membership in a spiritual community, however, may extinguish an inmate's last source of hope for dignity and redemption.") (Brennan, J., dissenting). But it also stems from the conviction that the right to observe one's faith is one of the most treasured birthrights of every American.

Nevertheless, prisoners do not have untrammeled rights under the Free Exercise Clause. The Supreme Court has cautioned that managing "a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislature and executive branches of the government." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Thus, courts construing the Free Exercise Clause have given deference to the expertise of prison administrators in allocating resources and in establishing procedures to maintain order and security. *See Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) ("[C]hallenges to prison restrictions ... must be analyzed in terms of the legitimate policies and goals of the corrections system[.]")

In *Turner*, a case involving mail and marriage restrictions, the Supreme Court articulated a minimal scrutiny test for evaluating prisoners' constitutional claims. The Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. 2254. *Turner* also considered other factors, including the existence of alternative means for inmates to exercise their constitutional rights; the impact that accommodation would have on guards, inmates, and prison resources; and whether alternatives to the prison regulation are available at a "de minimus cost." *Id.* at 90–91, 107 S.Ct. 2254.

In *O'Lone*, the Court explicitly applied *Turner* to a case involving a prisoner's free exercise rights. *O'Lone* involved prison work policies that prevented Muslim prisoners from attending Islamic Jumu'ah services. *O'Lone*, 482 U.S. at 347, 107 S.Ct. 2400. Applying *Turner*, the Court upheld the restriction. *Id.* at 353, 107 S.Ct. 2400. It concluded that there was a valid connection between the regulation and the prison's interests in safety and rehabilitation. *Id.* at 350–51, 107 S.Ct. 2400. It also found that Muslim prisoners could express their faith in alternative ways. *Id.* at 352, 107 S.Ct. 2400. The Court examined whether less burdensome alternatives were available at de minimus cost, and concluded that they were not. *Id.* at 353, 107 S.Ct. 2400. The regulations therefore withstood *Turner's* minimal scrutiny.

## 2. *Smith*

The standard for evaluating free exercise claims brought by nonprisoners was much stricter. In *Sherbert v. Verner,* 374 U.S. 398, 406–07, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the Supreme Court explicitly held that strict scrutiny was the appropriate test. In that case, the state denied unemployment benefits to a woman who quit her job rather than work on her Sabbath. The Supreme Court found that the denial of benefits imposed a substantial burden on religious exercise: the woman had to choose between an income and her faith. *Id.* at 406, 83 S.Ct. 1790. The Court noted that the issue "was whether some compelling state interest enforced in the eligibility provisions of the ... statute justifies the substantial infringement of appellant's First Amendment right." *Id.* The Court found no compelling interest and concluded that the denial of benefits violated the appellant's free exercise rights.[8] *Id.* at 407, 83 S.Ct. 1790.

But free exercise law changed dramatically in 1990 when the Supreme Court decided *Employment Div., Dep't of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876. *Smith* involved a challenge by Native Americans to a law prohibiting the ingestion of peyote. The Court found that the law did not violate the Free Exercise Clause even though some Native Americans used peyote as an integral part of their religious ceremonies—the law applied to everyone in the state and did not single out religious conduct. *Id.* at 1202. In reaching its decision, the Court specifically rejected the test developed in *Sherbert* and held that facially neutral laws of general applicability that burden religious exercise require no special justification to satisfy First Amendment scrutiny. *Smith,* 494 U.S. at 883–84, 110 S.Ct. 1595. Thus, "no matter how much a law burdens religious practices it is constitutional under *Smith* so long as it does not single out religious behavior for punishment and [is] not motivated by a desire to interfere with religion." Chermerinsky, *supra,* at 1201.

## 3. The RFRA and RLUIPA

Congress enacted the Religious Freedom Restoration Act (the "RFRA") in 1993 in direct response to *Smith.* The stated purpose of the Act was to "restore the compelling interest test as set forth in *Sherbert v. Verner* and *Wisconsin v. Yoder[,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)]* " and to apply it to all government acts that "substantially burden" religious exercise, even if the burden results from a rule of general applicability. 42 U.S.C. §§ 2000bb–1, 2000bb(b) (1994). The statute drew no distinction between claims by prisoners and claims by others; in fact, its legislative history made clear that courts were to apply strict scrutiny to prisoners' claims. *See* S.Rep.No. 111, 103d Cong., 1st Sess. 9 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1899 (expressing intent to restore "the protection accorded to prisoners to observe their religions[,] which was weakened by the decision in *O'Lone v. Estate of Shabazz* ").

The Supreme Court struck down the RFRA in 1997, at least insofar as the statute related to state and local governments, in *City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d

---

**8.** "Although *Sherbert* clearly stated that strict scrutiny was to be used in evaluating laws infringing on free exercise of religion, following *Sherbert* the Court rarely struck down laws on this basis." Erwin Chermerinsky, *Constitutional Law: Principles and Policies* § 12.3.2.2, at 1206 (2d ed.2002). "In fact, there were only two areas where the Court invalidated laws for violating free exercise: laws, like the statute in *Sherbert,* that denied benefits to those who quit their jobs for religious reasons; and the application of a compulsory school law to the Amish." *Id.*

624. The Court found that though Congress may enforce constitutional rights under Section 5 of the Fourteenth Amendment, the RFRA exceeded that authority by defining rights instead of enforcing them. *Id.* at 532, 117 S.Ct. 2157. The RLUIPA represents Congress's attempt to avoid the constitutional problems that led to the invalidation of the RFRA. The general rule of the RLUIPA is the same as that of the RFRA—the statute provides that state action that "substantially burden[s]" religious exercise must be justified as the "least restrictive means" of furthering a "compelling governmental interest." *See* 42 U.S.C. §§ 2000cc(a)(1), 2000cc–1(a). Congress, however, narrowed the reach of this rule to zoning ordinances and institutionalized persons. It also avoided Section 5 of the Fourteenth Amendment as the source of its authority, opting instead to use the Spending Power and Commerce Clause. 42 U.S.C. §§ 2000cc–1(b)(1), 2000cc–1(b)(2).

In *Mayweathers v. Newland*, 314 F.3d 1062, 1066 (9th Cir.2002), the Ninth Circuit upheld the RLUIPA as a constitutional exercise of Congress's spending power. It also upheld the statute against challenges based on the Establishment Clause, Tenth Amendment, Eleventh Amendment, and separation of powers. *Id.* at 1068–70. At least three courts have held that the RLUIPA violates the Establishment Clause. *See Cutter v. Wilkinson*, 349 F.3d 257 (6th Cir.2003); *Madison v. Riter*, 240 F.Supp.2d 566 (W.D.Va.2003); *Kilaab Al Ghashiyah (Khan) v. Dep't of Corrections of State of Wisconsin*, 250 F.Supp.2d 1016 (E.D.Wisc.2003). The Defendants ask the Court to do the same. This Court, however, is bound by Ninth Circuit law.

## C. Substantial Burden on Religious Exercise

RFRA case law yielded three main interpretations of the statute's substantial burden prong: the compulsion test, the centrality test, and the religious motivation test. *See* Steven C. Seeger, Note, *Restoring Rites to Rites: the Religious Motivation Test and the Religious Freedom Restoration Act*, 95 Mich. L.Rev. 1472, 1474 (1997). The compulsion test limited the RFRA to practices that were mandated or compelled by the claimant's religion. *See, e.g., Goodall v. Stafford County Sch. Bd.*, 60 F.3d 168, 172–73 (4th Cir.1995) (finding no substantial burden because the claimants "have neither been compelled to engage in conduct proscribed by their religious beliefs, nor have they been forced to abstain from any action which their religion mandates that they take."). A related test, the centrality test, required a claimant to establish that the burdened practice interfered with a central tenet of religious doctrine.[9] *See, e.g., Abdur–Rahman v. Michigan Dep't of Corrections*, 65 F.3d 489, 491–92 (6th Cir.1995) (finding no substantial burden because the practice was not "essential" or "fundamental" to the claimant's religion). A third approach, the religious motivation test, defined the substantial burden prong more broadly: religious adherents could satisfy this standard by demonstrating that the government prevented them from engaging in conduct both important to them and motivated by sincere religious belief. *See, e.g.,*

---

9. The Ninth Circuit used a standard that combined both centrality and compulsion. *See Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995) ("In order to show a free exercise violation using the substantial burden test, the religious adherent ... has the obligation to prove that a governmental action burdens the adherent's practice of his or her religion ... by preventing him or her from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.") (internal quotation marks and brackets omitted).

*Rouser v. White,* 944 F.Supp. 1447, 1455 (E.D.Cal.1996) ("[A] restriction on practices subjectively important to plaintiff's sincerely held religious understanding is a substantial burden within the meaning of RFRA."); *Muslim v. Frame,* 891 F.Supp. 226, 231 (E.D.Pa.1995) ("[A] plaintiff's burden under the RFRA is satisfied by showing that the government has placed a substantial burden on a practice motivated by sincere religious belief."); *cf. Mack v. O'Leary,* 80 F.3d 1175, 1180 (7th Cir.1997) ("The proper and feasible question for the court is simply whether the practices in question are important to the votaries of the religion.")

## 1. The Compulsion and Centrality Tests

Several commentators criticized the compulsion and centrality tests as too restrictive and inconsistent with the broad remedial goals of the RFRA. *See* Seeger, *supra,* at 1499–1512; Daniel J. Solove, Note, *Faith Profaned: The Religious Freedom Restoration Act and Religions in the Prisons,* 106 Yale L.J. 459, 476 (1996); *see also Mack,* 80 F.3d 1175, 1179 (7th Cir.1997). Both tests excluded a wide array of practices that most observers would consider religious. As Judge Posner pointed out in *Mack,* there "are many religious practices that clearly are not mandatory, such as praying the rosary, in the case of Roman Catholics, or wearing yarmulkes, in the case of Orthodox Jews[.]" 80 F.3d at 1179. Similarly, few practices are absolutely central or essential to a claimant's religion. Yet, noncentral and noncompelled practices form a valuable part of religious experience and "are important to their practitioners, who would consider the denial of them a grave curtailment of their religious liberty." *Id.*

The compulsion and centrality tests also threatened to exclude minority religions from the RFRA's protection. As Seeger points out, while "some religions instruct their followers to obey the commands and prohibitions of the faith," others, "especially those outside the Judeo–Christian tradition, lack the concept of religious compulsion." Seeger, *supra,* at 1503. "Theravada Buddhism, for example, is a nonduty-based religion, which emphasizes inward spiritual maturity rather than obedience to religious mandates." *Id.* Furthermore, not all religions have practices that are more central than others. "[F]aiths that either embrace all religions, such as certain New Age religions, or groups that support no unifying creed, such as the Quakers, may not be able to demonstrate that any particular practice is central to their religious beliefs." *Id.* By giving less protection to minority religions, the tests "betray[ed] the spirit of the ecumenical coalition that rallied support for the Act" and "violat[ed] a central purpose of the RFRA—to prevent the government from imposing majoritarian conceptions of religion." *Id.*

But the "primary difficulty" with the tests "[was] that neither standard [could be] meaningfully administered by the courts." *Id.* at 1506. The tests "assume[d] that courts [were] capable of discerning whether a practice [was] central to or compelled by a claimant's religious beliefs." *Id.* But "courts lack the capacity to make such judgments, because there is no definitive authority against which to measure a claimant's assertions regarding centrality or compulsion." *Id.* "Neither religious texts, nor even those in positions of spiritual leadership, can disprove the religious beliefs of an individual believer." [10]

10. The centrality and compulsion were almost always applied from an objective standpoint. *See Abdur–Rahman,* 65 F.3d 489, 492 (6th Cir.1995) (finding that Friday services were not "fundamental" to the claimant's religion based on a chaplain's testimony about Islam); *Rhinehart v. Gomez,* No. 93–CV–3747, 1995

*Id.; see also Smith,* 494 U.S. at 887, 110 S.Ct. 1595 ("[W]hat principle of law or logic can be brought to bear on a believer's assertion that a particular act is 'central' to his personal faith?"); *Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith . . . .")

Courts faced with RFRA claims often made "the mistake of accepting the testimony of other members of the claimant's religion," believing that such testimony could establish whether the practice in question was central or compelled. Seeger, *supra,* at 1507 (citing *Abdur–Rahman,* 65 F.3d at 492). But religion is "an intensely personal experience." *Id.* "Individuals invariably form religious views that differ from those held by members of the same faith," and "the right to the free exercise of religion includes the right to develop views that vary from those of other believers." *Id.; see also Thomas v. Review Bd.,* 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment Protection.")

Some courts also made the mistake of resorting to religious texts to determine centrality or compulsion. But "[r]eligious texts provide an improper basis for contesting the views of a claimant, given that [they are often] susceptible to different interpretations." *Id.; see also Thomas,* 450 U.S. at 716, 101 S.Ct. 1425 ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural

interpretation."). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion . . . ." *West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The compulsion and centrality tests required courts to "offer a definitive interpretation of religious doctrine whenever there [was] a dispute about whether a given practice was central or compelled." Seeger, *supra,* at 1512. "Such unsavory inquiries violate[d] the rights of individual believers and undermine[d] the traditional prohibition against a judicial resolution of theological disputes." *Id.*

## 2. The Religious Motivation Test

The religious motivation test—which defined substantial burden as state action that prevented religious adherents from engaging in conduct both important to them and motivated by sincere religious belief—avoided many of the pitfalls of the centrality and compulsion tests. First, the test was more sensitive to religious experience. "Noncentral [and noncompelled] practices contribute to the richness of religious experience, complementing the fundamental aspects of one's faith in meaningful ways." Seeger, *supra,* at 1501. "Such practices often serve as an expression of the believers faith, and allow individuals to carry out their beliefs in everyday life." *Id.* "The exclusion of noncentral [and noncompelled practices] [from the RFRA] deprive[d] believers of the [ability] to participate fully in their religious heritage, and thus [fell] short of the [RFRA]'s goal to secure religious freedom for individual believers." *Id.* at 1501–02.

WL 364339, at *5 (N.D.Cal. June 8, 1995) (rejecting a prisoner's objection to tuberculosis testing on the basis of testimony from a Muslim authority). When the tests turned on the subjective religious understanding of the plaintiff, they more closely approximated the religious motivation test. *See, e.g., Rouser,* 944 F.Supp. at 1455.

Unlike its counterparts, the religious motivation test also extended the protection of the RFRA to all religious groups. "Under this approach, followers of any religion could invoke the RFRA" when the government burdened religiously motivated conduct. *Id.* at 1505. "Unlike [the centrality and compulsion tests], which exclude[d] certain religious groups from the outset, the motivation test allow[ed] followers of any religion to utilize the Act when the government infringe[d] upon [their religious exercise]" *Id.* "Presumably, no religious adherent can claim to be excluded by a standard that protects religiously motivated conduct." *Id.* "By extending the RFRA to followers of all religions, the motivation test reflect[ed] an appreciation for the origins of the statute, protect[ed] minority groups that would remain vulnerable in the political process, and remain[ed] faithful to the requirements of the Constitution." *Id.* at 1505–06.

Finally, the test avoided "the treacherous business of deciding the place of a religious practice" in the life of the claimant. *Id.* at 1513. (quotation omitted). It asked courts to decide only whether a practice was important to the claimant and motivated by sincere religious belief. "Courts [and triers of fact] are routinely called upon to make determinations of motivation in other areas in the law." *Id.; see also Rouser*, 944 F.Supp. at 1455 (E.D.Cal.1996) ("The law frequently requires proof of state of mind, and the fact that such proof is always circumstantial has not constituted an insurmountable barrier to conviction for specific intent crimes, or liability for malicious conduct."). By

concentrating on a question often raised in other cases, "the motivation standard allow[ed] courts to stay within the bounds of their judicial capacities." [11] *Id.*

Some courts feared that the religious motivation test gave too much protection to religion. *See Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C.Cir.2001) ("[I]t is hard to think of any conduct that would not potentially qualify as religiously motivated[.]"). Those fears were misplaced. First, the test required the claimant to demonstrate that religion principally motivated the activity in question and the most sensible version of the test also required that the practice be important to the claimant. *See* Seeger, *supra*, at 1503 n. 153; *Rouser*, 944 F.Supp. at 1455; *Mack*, 80 F.3d at 1179. Second, "courts [were not] forced to accept the individual's assertion without further inquiry." Seeger, *supra*, at 1503 n. 153. "On the contrary, the court [had to] determine whether a litigant [was] sincere in her religious objection to a government policy." *Id.* Third, even if the courts determined the merit of some sincere claims, the litigation would not paralyze the state: the government always had the opportunity to justify its practice under the compelling state interest test.

■ The RLUIPA "was intended to and does upset" the centrality and compulsion tests that had been articulated in prior RFRA case law. *Elsinore Christian Center v. City of Lake Elsinore*, 270 F.Supp.2d 1163 (C.D.Cal.2003). By stating that the centrality or mandatory nature of a religious belief is immaterial to whether or not that belief constitutes religious exer-

---

11. "As with all such issues of motive," the trier of fact must determine whether the circumstantial evidence suffices to demonstrate the element." *Rouser*, 944 F.Supp. at 1455. Though "evidence concerning the conventional practice of a particular religion is not determinative, it does not follow that such evidence is irrelevant to a contested issue of

sincerity." *Id.* "Other evidence which may bear on the issue of sincerity includes the testimony of plaintiff, plaintiff's conduct, a demonstrated willingness to forego privileges by virtue of religious commandment, the consistency of plaintiff's adherence, and other evidence reasonably having a tendency to prove or disprove the issue." *Id.*

cise, "the RLUIPA establishes an entirely new and different standard" than that employed in many RFRA cases. *Id.; see also* 42 U.S.C. § 2000cc–5(7)(A) (defining religious exercise as "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief.") (emphasis added); 42 U.S.C. § 2000cc–3(g) (stating that the RLUIPA shall be construed "in favor of a broad protection of religious exercise"). Although the text of the RLUIPA does not specifically mention the religious motivation test, given the statute's explicit rejection of the centrality and compulsion tests, the Court finds that the motivation test accurately reflects the meaning of substantial burden under the Act—state action substantially burdens the exercise of religion within the meaning of the RLUIPA when it prevents a religious adherent from engaging in conduct both important to the adherent and motivated by sincere religious belief.[12] *But see San Jose Christian College v. City of Morgan Hill*, No. C01–20857, 2002 WL 971779, at *2 (N.D.Cal. March 5, 2002) (applying pre-RLUIPA "substantial burden" test to RLUIPA claim).

## D. Analysis

### 1. The Defendants' Refusal to Allow Coronel to Attend Pasqua Yaqui and Native Hawaiian Religious Ceremonies

 Coronel claims that the Defendants have substantially burdened his religious exercise within the meaning of the RLUIPA by refusing to allow him to attend Pasqua Yaqui and native Hawaiian religious ceremonies.[13] Although Coronel admits that he is not a Pasqua Yaqui or a native Hawaiian, he alleges that the religions practiced by those groups are similar to his own. (Verified First Am. Compl. at 9.) He claims that participating in Pasqua Yaqui and native Hawaiian services was and is necessary for him to achieve "meaningful satisfactory religious exercise" and asserts that the Defendants have "isolate[d]" him from his "fellow pagan practitioners" and "prohibit[ed] the sharing of their common eclectic pagan rites, rituals, prayers, and other religious components[.]" (*Id.*)

The Defendants argue that they have placed no burden whatsoever on Coronel's

12. The RLUIPA's legislative history indicates that Congress did not intend courts to measure substantial burden on religious exercise by reference to centrality or compulsion. 146 Cong.Rec. S7774, S7776 (stating that substantial burden "as used in the Act should be interpreted by reference to Supreme Court jurisprudence"). As Professor Laurence Tribe notes, "true, centrality does help explain some holdings, and the Supreme Court in *Sherbert* and especially in *Yoder* emphasized the centrality of the burdened beliefs." *American Constitutional Law* § 14–12, 1247 (2d ed.1988). "However, the Court has never specifically required free exercise claimants to demonstrate that the state requirement burdens a central tenet of their beliefs." *Id.; see also* Seeger, *supra,* at 1484–1495 (surveying case law and stating that the Court has never required centrality or compulsion); *Levitan v. Ashcroft*, 281 F.3d 1313, 1319 (D.C.Cir.2002) ("A requirement that a religious practice be mandatory to warrant First Amendment protection finds no support in the cases of the Supreme Court or of this Court.")

13. To the extent that Coronel alleges that the Defendants violated the RLUIPA by terminating the native Hawaiian religious group, he may lack standing to bring such a claim. Coronel does not claim to be a native Hawaiian or a member of the native Hawaiian religious group. To demonstrate standing, a plaintiff must show an " 'injury in fact'—an invasion of a legally protected interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (plurality opinion); *Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (at an "irreducible minimum," a plaintiff must "show he personally has suffered some actual or threatened injury.")

ability to practice his *own* religion: rather, they argue that Coronel "was merely prohibited from attending the services of other religions." (Defs.' Cross Mot. for Summ. J. at 8.) Citing to *Modern Day Dianic Practice*, they claim that Dianics should worship only with other Dianics. (Defs.' Cross Mot. for Summ. J. at 10.) There is no support in that text for this statement: *Modern Day Dianic Practice* indicates that Dianic practices "vary between individuals." (Exh. 4 to DSOF at 9.) More importantly, individuals have the right to exercise their faith in unique and nontraditional ways. *See Frazee v. Illinois Dept. of Employment Sec.*, 489 U.S. 829, 834, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989) ("[W]e reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization.") Resort to texts to determine the scope of a believer's faith is impermissible—courts are not competent to resolve matters of religious doctrine. *See Thomas*, 450 U.S. at 716, 101 S.Ct. 1425 ("Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences.")

The question under the RLUIPA's substantial burden prong, as this Court interprets it, is whether the state has prevented Coronel from engaging in conduct both important to him and motivated by sincere religious belief. Coronel claims that worshiping with the Pasqua Yaquis and the native Hawaiians is both religiously motivated and necessary for him to "achieve meaningful satisfactory religious exercise." (Verified Am. Compl. at 4, 9–10). He has also submitted affidavits from a number of

his fellow inmates as evidence of his sincerity. (*See* Lester Aff. ¶ 4, attached as Exh. 3 to Pl.'s Mot. for Summ. J. ("I have personally observed on many occasions the participation of Hawaii[an] inmate Paul Kay Coronel in the [I]ndian religious ceremonies prior to the departure of Program Manager Chuirch and Warden Pablo Sedillo."); (Draizen Aff. ¶ 3, attached as Exh. 4. to Pl.'s Mot. for Summ. J.) ("[Y]our Affiant has observed and witnessed Hawaii[an] inmate Paul Kay Coronel participate in religious ceremonies with the Pascua [*sic*] Yaqui [I]ndians prior to the departure of Program Manager Chuirch and Warden Pablo Sedillo.")).

The Defendants challenge Coronel's claim of religious motivation. Because Coronel admits that he is not a Pasqua Yaqui or a native Hawaiian, the Defendants infer that Coronel is simply "seeking a way to assemble with other inmates, who are not Dianic [pagans], and using the guise of the RLUIPA to obtain increased visitation rights that are not permitted within Defendant FCC." [14] (Def.'s Cross Mot. for Summ. J. at 4.) It is not uncommon for inmates to raise free exercise claims in order to obtain special benefits or to avoid certain prison requirements. *See Theriault v. Silber*, 453 F.Supp. 254, 260 (D.C.Tex.1978) (inmates requested Chateaubriand and Harveys Bristol Cream every other Friday as part of the practice of their religion); *Doty v. Lewis*, 995 F.Supp. 1081, 1085 (D.Ariz.1998) (prison chaplain testified that one prisoner had claimed that his religion required that he consume a fifth of whiskey every week). Given that Pasqua Yaqui and native Hawaiian religions differ at least in some respects from Dianic paganism,[15] it is not unreasonable

14. There is no dispute over whether Dianic paganism is a religion or whether Coronel's is a sincere practitioner of that religion. The Defendants' challenge is much narrower: whether Coronel's desired practice, which is

to worship with the Pasqua Yaquis and native Hawaiians, is sincere and religiously motivated.

15. There is no information in the record about the Pasqua Yaqui and native Hawaiian

for the Defendants to question Coronel's motives.

Where questions regarding a litigant's state of mind, motive, sincerity or conscience are implicated, "it is unusual that disposition may be made by summary judgment." *Consolidated Elec. Co. v. U.S. for Use & Benefit of Gough Indus., Inc.,* 355 F.2d 437, 438–39 (9th Cir.1966). "The need for full exposition of facts is profound under such circumstances since determining a man's state of mind is an awesome problem, capable of resolution only by reference to a panoply of subjective factors." *Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984) (quotation omitted). "Traditionally, this function has been entrusted to the jury." *Id.* Because Coronel's credibility is a key issue, both parties' motions for summary judgment will be denied. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (credibility determinations are the province of the jury).

The Defendants have asked for an opportunity to address the argument that any burden imposed on Coronel's religious exercise was due to a compelling state interest and was the least restrictive means of furthering that interest, if the Court ruled against them on the substantial burden issue. Because the Court has found a triable issue on the question of substantial burden, it will give the Defendants thirty days (30) from the date of this Order to move for summary judgment on compelling state interest and least restrictive means components of the RLUIPA.

## III. Remaining Claims

Neither party has specifically addressed Coronel's claims that Defendants violated by the RLUIPA by failing to establish a WICCA program and by terminating the native Hawaiian religious group. Nor has either party addressed Coronel's Free Exercise Clause claim. The Court reserves all such issues for trial, assuming the evidence makes those issues material.

## IV. Coronel's Motion for Sanctions

■ Coronel has moved for sanctions against the Defendants, claiming that their affidavits in support of their Cross Motion for Summary Judgment are "false and misleading." (*See* Doc. # 69 at 3.) Rule 56(g) of the Federal Rules of Civil Procedure provides that should the Court become convinced that any affidavits submitted under Rule 56 have been presented in bad faith or solely for the purpose of delay, the court "shall forthwith order the party employing them" to pay the nonoffending party the amount of the reasonable expenses, "including reasonable attorneys' fees," that the filing of the affidavits caused the nonoffending party to incur. There is no evidence, beyond mere allegation, that the Defendants affidavits have been submitted in bad faith. Coronel's Motion for Sanctions will therefore be denied.

Accordingly,

**IT IS ORDERED** that Defendants Richard Paul, Frank Luna, and Corrections Corporation of America's Motion to Strike [Doc. # 75] is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff Paul Kay Coronel's Motion for Summary Judgment [Doc. # 61] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants Richard Paul, Frank Luna, and Corrections Corporation of America's Cross Motion for Summary Judgment [Doc. # 65] is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff James Kay Coronel's Motion for Sanctions [Doc. # 69] is **DENIED.**

religions, aside from Coronel's statements that they are both "pagan" religions; however, Coronel does not contest that the religions differ, at least to some degree, from his own.

**IT IS FURTHER ORDERED** that Defendants Richard Paul, Frank Luna, and Corrections Corporation of America shall have thirty (30) days from the date of this Order within which to move for summary judgment on the "compelling state interest" and "least restrictive means" components of the RLUIPA.